John D. SULLIVAN

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY and Massachusetts Mutual Corporate Investors, Inc.

Civ. No. B–88–427 (JAC).

United States District Court,
D. Connecticut.

Aug. 28, 1992.

Elliot R. Warren, Westport, Conn., for plaintiff.

Carla R. Walworth, Day, Berry & Howard, Hartford, Conn., for defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

JOSÉ A. CABRANES, Chief Judge:

This case takes us to the outer limits of the erosion of the doctrine of employment at will under Massachusetts law created by the enforcement of putative oral contracts and employer liability for discharges said to be contrary to public policy. Plaintiff John D. Sullivan ("Sullivan") sues his former employer, Massachusetts Mutual Life Insurance Company ("Mass. Mutual") and its wholly-owned subsidiary, Massachusetts Mutual Corporate Investors, Inc. ("Corporate Investors"), alleging that he was fired because he "blew the whistle" on suspected securities law violations at Mass. Mutual and that he was fired in breach of an oral contract providing that he would be dismissed only for good cause. Pending before the court is Defendants' Motion for Summary Judgment (filed Jan. 11, 1991).

### BACKGROUND

The Complaint (filed Aug. 9, 1988) ("Complaint") initially made out three claims for relief. Plaintiff's first claim alleges that he was terminated by defendants in breach of contract. The second claim alleges that plaintiff was discharged in violation of public policy. The third and final claim alleges a pattern of "racketeering" in violation of the Racketeer–Influenced and Corrupt Organizations Act, or RICO. This third claim was voluntarily dismissed with prejudice in a motion granted by the court on June 26, 1990, leaving only the first two claims pending for adjudication.

The facts relevant to defendants' motion for summary judgment are these. Plaintiff was hired by Mass. Mutual as an assistant securities analyst in February, 1985, at a salary of $28,500. Plaintiff was apparently in the early stages of his career in business. He had received his undergraduate degree at the University of Connecticut in 1977, and had subsequently received a master's degree in business administration from the University of Rhode Island in 1981. Before he joined Mass. Mutual, plaintiff had worked for a short period at

the Connecticut National bank, and previously had worked as an actuarial research analyst for the Hartford Insurance Group.

At his deposition, plaintiff testified that, prior to accepting the offer of a job with Mass. Mutual, he had gone to dinner with Gary Wendlandt, a manager at Mass. Mutual who was principally responsible for hiring plaintiff and for whom plaintiff would work at the company. Plaintiff testified that Wendlandt had stated that defendants' operations were growing, that the future for plaintiff was bright, and that plaintiff might eventually become a vice president of Mass. Mutual. Plaintiff testified also that when he asked Wendlandt whether Wendlandt had ever had to fire anyone, Wendlandt answered ambiguously that someone had once left, and although plaintiff did not understand Wendlandt's answer, he did not pursue the matter. When asked at deposition whether he had tried to bargain or negotiate with anyone over the conditions under which he might be terminated, plaintiff answered "no." Defendants' Motion for Summary Judgment (filed Jan. 10, 1991), Ex. C (Continued Deposition of John D. Sullivan) at 50. In an affidavit sworn to in response to the pending motion for summary judgment, however, plaintiff avers that at the dinner meeting Wendlandt stated that

> he had never terminated anyone in the division. Wendlandt stated that he did not expect that I would need to worry about termination. It was clear from Wendlandt's statements that he wanted me to believe that if I accepted a job with defendants, I would not be terminated except for cause.

Affidavit of John D. Sullivan (filed May 21, 1991) ("Sullivan Affidavit") ¶ 7.

Plaintiff did not have a written contract specifying the terms and conditions of his employment, and the Mass. Mutual employee handbook, which plaintiff received and read, specifically disclaimed creating any contractual liability. Plaintiff has abandoned his earlier contention in responses to interrogatories that recommended employee discipline procedures in the employee handbook created an enforceable contract.

Transcript of January 21, 1992 Hearing (filed Feb. 12, 1992) ("Tran.") at 20.

Plaintiff progressed and earned a few raises the following year. Working in Mass. Mutual's Securities Investment Division, plaintiff was responsible for calculating the number of shares of certain restricted securities defendants could sell under SEC Rule 144. Plaintiff also occasionally performed tasks for the benefit of defendant Corporate Investors, although plaintiff had been hired by and was paid by Mass. Mutual. Plaintiff's picture appeared in Corporate Investors annual report for 1986, although under the erroneous name of "James Sullivan." At the time, many of the employees in the Securities Investment Division at Mass. Mutual were also officers of or otherwise affiliated with Corporate Investors.

By his own account, plaintiff's difficulties began when in April 1986 he was apprised by defendants' in-house counsel, Attorney Wallace Rodger ("Rodger"), that defendants' employees were in possession of material inside information of Cardis Corporation, a company in which defendants held stock that they were planning to sell. On the order of Rodger, defendants decided not to sell stock in Cardis, even though defendants later determined that they did not in fact possess material non-public information. This decision was made in plaintiff's absence before plaintiff learned of the situation, but afterwards Rodger expressed concern to plaintiff that a securities law violation might have occurred had sales in Cardis not been suspended.

Plaintiff states that Rodger also told plaintiff that Richard Morrison, an officer senior to plaintiff in plaintiff's division, might possess material inside information regarding World ACCO Corporation ("ACCO"). Defendants had begun selling ACCO stock in early April 1986. On April 29, 1986, Rodger and plaintiff met with Morrison to discuss possible inside information defendants possessed concerning ACCO, and afterwards suspended trading in ACCO. Defendants contend that there is no evidence, however, that insider trading actually occurred.

Plaintiff alleges that, subsequent to these events, which coincided roughly in time with several well-publicized Wall Street insider-trading scandals, he became concerned that he would be subject to liability for possible insider trading violations in his job at Mass. Mutual. Plaintiff asserts that he expressed these concerns repeatedly to his superiors at Mass. Mutual, and proposed that defendants insulate trading operations from other divisions of Mass. Mutual to prevent possible insider trading. Specifically, at deposition plaintiff testified that he proposed

> a system where we would meet what the CFA [Chartered Financial Analyst] wanted us to, put it in as spelled out in the standards and practice book, and Boston University course recommended like a Chinese wall and a compliance system where we have paperwork and things like that.

Defendants' Motion for Summary Judgment (filed Jan. 11, 1991), Ex. D (Deposition of John D. Sullivan) at 67. Plaintiff, however, made no complaint to any state or federal authorities during his tenure with defendants, Statement of Undisputed and Material Facts in Support of Defendants' Motion for Summary Judgment (filed Dec. 28, 1990) ("Defendants' Facts") ¶ 23. At the time, Mass. Mutual had in place a system for compliance with the securities laws with respect to insider trading. *Id.* ¶ 18.

Sullivan's expertise in the area of insider trading would appear to have been extremely limited. Defendants paid plaintiff to attend a week-long course for the Level 3 Chartered Financial Analyst examination, but plaintiff later failed the examination. *Id.* ¶ 12. In fact, plaintiff testified at deposition that his knowledge of the securities laws was confined to what he had learned at the course preparing him for the Level 3 Chartered Financial Analyst examination and from reading the newspapers. Defendants' Motion for Summary Judgment (filed Jan. 11, 1991), Ex. A (Deposition of John D. Sullivan) ("Sullivan Deposition") at 89.

It is not clear from the record what plaintiff actually told his superiors with respect to insider trading. In a certificate for Mass. Mutual that plaintiff signed on July 21, 1986, just about a month before he was fired and a couple of months after the Cardis and ACCO stock incidents, plaintiff wrote that he was "not certain" whether other, unidentified employees were in violation of company policy proscribing the use of insider information. Defendants' Motion for Summary Judgment (filed Jan. 11, 1991), Ex. T. Plaintiff asserts by affidavit that he requested to be given written rather than oral instructions on trading as a means of insulating himself from insider trading liability, Sullivan Affidavit ¶ 28, and that he expressed unspecified "concerns" about defendants' compliance with the securities laws to Robert Joyal ("Joyal"), a vice president of the Private Placement Department. *Id.* ¶ 30.

Plaintiff states in his affidavit that Joyal told him that plaintiff should not be concerned with defendants' compliance with the securities laws, that "everyone in the industry engaged in some insider trading," and that the activities of the persons implicated by plaintiff's concerns were valuable to defendants. *Id.* Plaintiff also states that following this conversation with Joyal, he "continued to question senior officers at Mass. Mutual and Corporate Investors to insure that defendants complied with insider trading laws." *Id.* ¶ 32. Plaintiff asserts that after he expressed concern over insider trading, his superiors began avoiding him, began treating him more harshly, and told him not to discuss insider trading with Attorney Rodger. *Id.* ¶ 31. Plaintiff states in his affidavit that he was subjected to a negative informal performance review evaluation that contravened Mass. Mutual's ordinary procedures, *id.* ¶¶ 33–35, and was specifically told by his superiors not to talk to anyone outside his department concerning insider trading, and that if he persisted in pursuing the matter, he would be "out the door." *Id.* ¶ 36. In their reply brief, defendants note that, at deposition, plaintiff, in describing his conversations with Joyal, made no reference to complaints about insider trading and made no reference to any alleged remarks that insider trading was practiced by "everyone in the

industry." However, defendants have not presented any deposition testimony directly contradictory to plaintiff's affidavit on this score.

Plaintiff was discharged by Mass. Mutual on August 25, 1986. Plaintiff contends that he was fired because he "discovered, disclosed, and complained of" insider trading violations or what plaintiff calls "near violations." Defendants contend that plaintiff was fired because of unsatisfactory work performance and point to various supervisors' complaints about the quality of plaintiff's work unrelated to any allegations of insider trading.

Subsequent to his termination, plaintiff sent an unsigned, anonymous letter to the Securities and Exchange Commission ("SEC") alleging that defendants had been engaged in insider trading. Mass. Mutual was informed of this letter, to which the SEC stated it gave "little credibility." Defendants' Motion for Summary Judgment (filed Jan. 11, 1991), Ex. Z (letter from SEC to Mass. Mutual). Subsequently Sullivan sent a signed letter complaining of the alleged violations, and, after an investigation, the SEC concluded that there had been no wrongdoing. Sullivan Deposition at 23.

At oral argument, plaintiff conceded that, contrary to the earlier assertions, *see, e.g.,* Complaint ¶ 23, he is not prepared to prove that defendants ever violated the securities laws. Tran. at 38, 46. Rather, plaintiff asserted that he reasonably believed that defendants had violated the securities laws and that he was discharged for having expressed concern over such possible violations. *Id.* at 17, 41–43. Although plaintiff did not raise the issue at oral argument, he presumably continues to press his claim that he was discharged in part for proposing an improved system to ensure defendants' compliance with the securities' laws. (Indeed, this claim may be encompassed by plaintiff's contention that he was discharged on account of his "concerns" over insider trading.)

Defendant Corporate Investors moves for summary judgment on all claims on the ground that it was not plaintiff's employer.

Both defendants move for summary judgment on plaintiff's claims for breach of contract and wrongful discharge.

## DISCUSSION

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (emphasis in original). While the court must view the inferences to be drawn from the facts in the light most favorable to the party opposing the motion, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). The non-moving party may defeat the summary judgment motion by producing sufficient specific facts to establish that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Finally, " 'mere conclusory allegations or denials' " in legal memoranda or oral argument are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist. *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)).

The parties agree that, at least for the purposes of this motion, all of plaintiff's

claims are governed by the law of Massachusetts.

### I.

■ Summary judgment is appropriate for Corporate Investors on all remaining claims because it is clear that it was not plaintiff's employer. The fact that some of the officers of that corporation were also plaintiff's supervisors at Mass. Mutual, that plaintiff was assigned tasks performed for the benefit of Corporate Investors, or that Corporate Investors once had an annual report with plaintiff's picture in it, did not make Corporate Investors plaintiff's employer. It is undisputed that plaintiff was hired, paid, and fired by Mass. Mutual. Accordingly, defendant Mass. Mutual, and not defendant Corporate Investors, was plaintiff's employer. *See generally Afonso v. City of Boston,* 587 F.Supp. 1342, 1347 (D.Mass.1984) (Massachusetts law) (employer is party that controls employee's actions).

### II.

Partial summary judgment is also proper for defendants on plaintiff's first claim, which alleges a breach of contract. Plaintiff has explicitly abandoned his contention that Mass. Mutual's employee handbook supports a contract claim for alleged failure to follow disciplinary procedures, Tran. at 20, and has by his silence implicitly abandoned any earlier contention during discovery that the letters exchanged when he was hired created a contract of employment with discharge for good cause only. *See* Defendants' Reply Brief in Support of Defendants' Motion for Summary Judgment (filed July 18, 1991) at 8 & n. 2. Rather, plaintiff's contract claim rests on two theories. Plaintiff first contends that the dinner conversation with Wendlandt before plaintiff was hired gave rise to an oral contract providing that plaintiff would be discharged only for cause. Second, plaintiff asserts that his discharge in violation of public policy violated the implied covenant of good faith and fair dealing in the employment contract under Massachusetts law.

■ As noted earlier, at deposition plaintiff admitted that in accepting his job with defendant he did not negotiate with defendant about termination, and that he had not pursued questioning Wendlandt on the subject of termination. Plaintiff's statement in his affidavit that he was made to understand that he would be terminated only for cause, Sullivan Affidavit ¶ 7, must be rejected as contradicting his deposition testimony. "The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans–Orient Marine Corp. v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991), *citing, inter alia, Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572, 578 (2d Cir.1969). Furthermore, plaintiff's statement that he was "made to understand" that he would be terminated for good cause only is merely conclusory and may not defeat summary judgment. *See, e.g., Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 46 (2d Cir. 1986) (unsupported "naked conclusion" in affidavit may not defeat summary judgment); *cert. denied* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987); *see also Quinn,* 613 F.2d at 445 (conclusory allegations or denials inadequate).

■ In any event, Wendlandt's alleged statement that he had never had to terminate anyone and that plaintiff did not have to worry about termination is the sort of "mere speculative expression[ ] of opinion and hope" that can not and does not create contractual liability. *Riley v. Cameron and Colby, Inc.,* 1987 WESTLAW 17537 at 2 (D.Mass.); *see also Treadwell v. John Hancock Mutual Life Ins. Co.,* 666 F.Supp. 278, 287 (D.Mass.1987). Plaintiff's dinner conversation with Wendlandt thus did not create a contract whereby plaintiff would be discharged from Mass. Mutual only for cause, and summary judgment for defendants is therefore granted on this claim.

■ Whether plaintiff may recover on his second contractual theory turns on whether he was discharged in violation of public policy. The Massachusetts courts

have held that a discharge in violation of public policy amounts to a breach of the implied covenant of good faith and fair dealing inherent in the contract of employment. *See, e.g., Gram v. Liberty Mutual Ins. Co.,* 384 Mass. 659, 429 N.E.2d 21, 27 & n. 6 (1981); *Siles v. Travenol Laboratories, Inc.,* 13 Mass.App. 354, 433 N.E.2d 103, 106, *rev. denied,* 386 Mass. 1103, 440 N.E.2d 1176 (1982); *Treadwell v. John Hancock Mutual Life Insurance Company,* 666 F.Supp. 278, 281 (D.Mass.1987). I turn now to plaintiff's claim that he was discharged in violation of public policy.

### III.

Plaintiff alleges that he was fired because he discovered, disclosed, and complained of defendants' violations of state and federal law and governing ethical codes with respect to the insider trading of securities. Plaintiff argues in particular that he was discharged because he complained about violations and "near violations" of the securities laws and ethical codes by defendants and proposed to defendants that procedures be improved to prevent future insider trading violations. Plaintiff's claims are multifaceted, and require extensive discussion of this evolving area of the law.

### A.

The Massachusetts Supreme Judicial Court has articulated the grounds of employer liability for discharging an employee in violation of public policy recognized thus far under Massachusetts law. These are: (1) firing an employee because the employee asserted a legally guaranteed right; (2) firing an employee because the employee did what the law requires; (3) firing an employee because the employee refused to do what the law forbids; or (4) firing an employee for cooperating with an ongoing criminal investigation by the authorities. *Flesner v. Technical Communications Corporation,* 410 Mass. 805, 575 N.E.2d 1107, 1110 (1991); *Smith–Pfeffer v. Fernald State School,* 404 Mass. 145, 533 N.E.2d 1368, 1371 (1989). However, the Supreme Judicial Court also has recognized the evolving nature of public policy discharge liability. *See Mello v. Stop & Shop Cos.,* 402 Mass. 555, 524 N.E.2d 105, 106 (1988) ("Our cases have not attempted in general terms to identify those principles of public policy that are sufficiently important and clearly defined to warrant recovery by an at will employee who is discharged for engaging in, or refusing to engage in, particular conduct"). In *Mello,* the Supreme Judicial Court assumed that discharging an employee for "whistleblowing" violates public policy, and upheld a judgment for the employer notwithstanding a plaintiff's jury verdict on the narrow ground that the evidence did not support a finding that the plaintiff was discharged for complaining about illegal activity, as opposed to activity in violation of the employer's internal policies. *See also Flesner,* 575 N.E.2d at 1111 (citing *Mello* with approval). In view of the expansive and evolving nature of liability for discharge against public policy under Massachusetts law, and the widespread recognition of liability for discharging "whistleblowers" in other jurisdictions, I conclude that plaintiff may state a claim upon which relief can be granted if he was fired because he "blew the whistle" on illegal practices at Mass. Mutual and Corporate Investors.

### B.

Defendants argue that the federal and state securities laws plaintiff contends he reasonably believed to have been violated were not intended to benefit plaintiff, and that therefore public policy does not support his claim for relief. This argument lacks merit. The purpose of public policy discharge liability is to promote obedience to the law regardless of whether the plaintiff is himself a victim of the disclosed illegal activity. By encouraging employees to "blow the whistle" on illegal activity and adding a disincentive for employers to violate the law, the theory of liability, it is said, advances public policy as expressed in statutes and regulations.

### C.

Defendants also contend that whistleblowing is protected only when the alleged

violations of law concern the public health or safety. This argument lacks a basis in both policy and precedent. While many whistleblowing cases do concern health and safety, the cases themselves do not purport to state such a limitation. Indeed, there are reported cases in which employees discharged for disclosing violations of law unrelated to health or safety have been held to state a claim. *See, e.g., Appeal of Bio Energy Corp.*, 607 A.2d 606 (N.H.1992) (violation of wage regulations); *Schriner v. Meginnis Ford Company*, 228 Neb. 85, 421 N.W.2d 755 (1992) (odometer tamperage); *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 246 S.E.2d 270 (1978) (violation of consumer lending protection statutes); *but see Fowler v. Great Amer. Ins. Cos.*, 653 F.Supp. 692, 697 (N.D.Ill.1987) (holding in the alternative that Illinois insurance code did not establish sufficiently important public policy to protect employee from discharge). Indeed, statutory protection for whistleblowers makes no distinction between laws related to health or safety and laws advancing other goals. *See, e.g.,* N.H.Rev.Stat.Ann. § 275–E:2; Cal.Labor Code § 1102.5(b); 26 Me.Rev.Stat.Ann. § 833(1)(A). The limitation that defendants propose would, in fact, be contrary to one of the central purposes of the liability for discharge contrary to public policy, which is to promote public policy as expressed by law. It is noteworthy that in *Mello, supra,* the Supreme Judicial Court assumed that a discharge in retaliation for reporting fraud—in that case, fraud unrelated to health or safety—would give rise to employer liability for a discharge contrary to public policy.

### D.

■ Defendants also emphasize that plaintiff did not himself discover any securities law violations. Rather, plaintiff merely "tagged along" when Attorney Rodger had expressed some concern over possible violations. This argument does not defeat liability. While perhaps it is more heroic to be both an investigator and a whistleblower, the policies of the theory of liability are equally advanced by protecting those who learn of wrongdoing from others rather than discovering it firsthand.

### E.

■ Defendants' principal arguments have been that no violations of law in fact occurred (a point now effectively conceded by plaintiff); that plaintiff never reported any supposed violations to the authorities during his tenure at Mass. Mutual; and that plaintiff never even told anyone at Mass. Mutual or Corporate Investors that he would report suspected violations to the authorities. Plaintiff responds to these arguments by asserting that he may make out a claim if he was fired for expressing his reasonable belief that violations had occurred. Although the parties did not brief the issue, at oral argument plaintiff drew the court's attention to the *Mello* case discussed above. In *Mello*, the court remarked in dicta that

> we assume that an at will employee who "blew the whistle" within his company on wrongdoing is entitled to protection (even though before discharge he did not complain to public authorities). We shall further assume that whistleblowing based on a reasonable, good faith (but erroneous) belief that the employer is violating the law should be protected in particular circumstances.

*Id.* at 108 n. 6.

Although these rules were both stated as dicta in *Mello*, I am persuaded that the Massachusetts Supreme Judicial Court would apply both if the questions were presented to it today. With respect to the contention that plaintiff's merely internal complaints were inadequate, I note that in *Noriss v. Lumbermen's Mutual Casualty*, 881 F.2d 1144, 1153 (1st Cir.1989), the Court of Appeals for the First Circuit, applying Massachusetts law, held that an employer could be liable for the discharge of an employee because of his purely internal complaints of violations of Nuclear Regulatory Commission regulations. This rule makes sense. A rule that would permit the employer to fire a whistleblower with impunity before the employee contacted the authorities would encourage employers

promptly to discharge employees who bring complaints to their attention, and would give employees with complaints an incentive to bypass management and go directly to the authorities. This would deprive management of the opportunity to correct oversights straightaway, solve the problem by disciplining errant employees, or clear up a misunderstanding on the part of a whistleblower. The likely result of a contrary rule would be needless public investigations of matters best addressed internally in the first instance. Employers benefit from a system in which the employee reports suspected violations to the employer first; the employee should not, in any event, be penalized for bestowing that benefit on the employer. *See Appeal of Bio Energy Corp.*, 607 A.2d at 608–09 (despite language of New Hampshire Whistleblower's Protection Act requiring employee to report suspected violation to the authorities, the employee is protected from discharge once he makes an internal complaint). I conclude that plaintiff's failure to contact the authorities concerning the alleged violations while he worked at Mass. Mutual does not by itself defeat his claim.

F.

■ As noted earlier, plaintiff concedes that he cannot prove that any actual violations of the securities laws took place during his tenure at Mass. Mutual, but relies upon the *Mello* decision, which assumed that an employee may recover if he is discharged for reporting merely suspected violations, where the belief is reasonable and in good faith. Such a rule is by no means unusual. As *Mello* observed, this is the rule in Michigan, 524 N.E.2d at 508 n. 6, *citing* Mich.Comp.Laws Ann. §§ 15.361 *et seq.; see also Melchi v. Burns International Secur. Services*, 597 F.Supp. 575 (E.D.Mich.1984) (applying Michigan whistleblower's protection statute), and may even be a majority rule, *see Schriner*, 421 N.W.2d at 759 ("an action for wrongful discharge lies when an at-will employee acts in good faith and upon reasonable cause in reporting his employer's suspected violation of the criminal code") (Nebraska law), N.H.Rev.Stat.Ann. § 275–E:2; Cal.Labor Code § 1102.5(b); 26 Me.Rev.Stat.Ann. § 833(1)(A). It may be argued that an employee should be required to prove the existence of an actual violation of law, since it is the public policy of the law alleged to have violated that is supposedly advanced by holding the employer liable for discharging a whistleblower. Arguably the goal of promoting obedience to law is not served when there has, in fact, been no legal violation. On the other hand, a standard of reasonable belief encourages a whistleblower to come forward, rather than remain silent out of fear that he might be wrong. Particularly in light of the *Mello* decision, I am persuaded that, if presented with the question, the Massachusetts Supreme Judicial Court would hold that the absence of a provable violation would not bar plaintiff's claim.

An issue lurking within the reasonable belief standard is whether plaintiff may make reasonable mistakes as to the law as well as reasonable mistakes as to the facts. In other words, is plaintiff protected by a form of "reverse qualified immunity"? I believe that the Massachusetts Supreme Court would hold that plaintiff may make reasonable mistakes as to the law, since the policy concerns of encouraging whistleblowing are similar if not identical to those with respect to mistakes of fact. Many areas of the law are evolving and unclear. Since Massachusetts law appears to favor encouraging whistleblowing, it would seem anomalous, for example, for a whistleblower to lose the protection of the law if he reported the violation of a law later held to contravene the Interstate Commerce Clause, or the violation of an agency regulation later held to exceed statutory authority. *Cf. Melchi*, 597 F.Supp. at 583 (employee made out prima facie case of public policy discharge without presenting evidence that falsification of nuclear power plant records is illegal) (Michigan law). On the other hand, reasonableness as to mistakes of law would have to be considered in view of the plaintiff's expertise. In this case, a jury could very well conclude that, in view of plaintiff's extremely limited knowledge of securities law, he could not

make any reasonable conclusions at all with respect to possible legal violations.

It may be argued with substantial force that the Massachusetts law governing liability for discharges against public policy has significant disadvantages. The focus on the reasonableness of a whistleblower's beliefs requires courts to decide extremely fact-intensive disputes rife with credibility and state-of-mind issues that are frequently not amenable to summary judgment and thus inevitably require a trial. Jury decisions will tend to be random, inviting litigation and discouraging settlement. In effect, a "reasonable belief" standard permits employees to bring suit if they ever voiced any concern about any possible legal violation, in the hope that, two, three, or even seven years after the fact, a jury will find that the voiced concern was the cause of the discharge. Possible violations of law are, of course, pervasive in our highly regulated system of industry and commerce. The possibility of retributive lawsuits by employees discharged for legitimate reasons cannot be discounted.

Given the increased threat of litigation over discharge decisions, employers will naturally seek to screen out potential litigants in the hiring process. Screening costs add an obvious, additional burden to the economy. Less obvious, but perhaps no less real, is the potential effect on hiring patterns. Inasmuch as increased litigation increases the cost of firing employees, employers will tend to hire those employees who may appear to present the least risks of discharge—that is, who appear to present the least risks with respect to ability to do the job and cooperate with fellow workers. Such a pattern may well work to the disadvantage of new entrants to the job market, such as racial or ethnic minorities lacking established credentials but who present potential, if uncertain, possibilities of excellence. Ethnic and cultural diversity, with their arguably attendant potential for employee tension and consequent employee discharge, may tend to lose favor in the workplace.

It is true that liability for discharges against public policy may deter employers from discharging employees who have brought to light violations of law, and will therefore increase the likelihood of "whistleblowing." However, there is a strong likelihood that the law will result in over-deterrence. Employers may be forced to retain malcontents who might, if discharged, sue on the grounds that they were fired because they voiced concerns about compliance with some law. In this case, as in others, voiced concerns in fact may amount to a possible libel of one's supervisors or fellow employees. Tensions in such circumstances will naturally rise. Requiring an employer to retain an employee who causes tension necessarily diminishes efficiency in the workplace, and therefore diminishes productivity in the economy as a whole. It is not at all clear that easing an individual plaintiff's burden in proving a discharge against public policy advances the general interest or welfare of workers as a group.

Lastly, the institutional role of the courts must be considered. While some states have statutes that protect whistleblowers, in Massachusetts and Connecticut the employees' whistleblowing rights are now largely the product of evolving common law. It is a substantial extension of the judicial role to determine or develop rules of general application regarding the discharge of employees. *See generally Adler v. American Standard Corp.*, 830 F.2d 1303, 1306–07 (4th Cir.1987) (courts should be reluctant to expand liability for discharge contrary to public policy, since public policy is unclear and should be left to the legislature). Fact-intensive scrutiny of employment decisions represents a substantial judicial inquiry into the management of enterprises of all types. It is highly doubtful that Connecticut, for example, would adopt the apparent Massachusetts rule excusing a discharged employee from having to prove that an actual violation of law occurred. *See generally Mangan v. Anaconda Industries, Inc.*, 193 Conn. 558, 479 A.2d 781 (1984) (declining to extend employer liability for dismissal); *Banerjee v. Roberts*, 641 F.Supp. 1093, 1107 (D.Conn.1986) (rationale of employer's liability for discharge contrary to public

policy under Connecticut law is that employee should not be put to an election whether to risk criminal sanction or jeopardize his continued employment).

### IV.

■ Several of plaintiff's alleged bases of recovery, however, are not viable even under a "reasonable belief" standard. Plaintiff may not recover on a theory that he was discharged for proposing an improved system whereby defendants would comply with the securities laws. The Massachusetts Supreme Judicial Court has held that a discharge based on proposals related to the employer's purely internal policies does not support public policy discharge liability. *Smith–Pfeffer*, 533 N.E.2d at 1371–72; *see also Mello*, 524 N.E.2d at 107 & n. 3 (discharge for complaints of violations of company policy not protected).

Furthermore, plaintiff has no claim for allegations that he was fired because he expressed concerns about "near violations." Public policy is concerned with preventing actual violations, and in protecting employees who are discharged for acting upon their reasonable, good faith belief that a violation of law has occurred or will occur.

■ Plaintiff has asserted that he expressed concern over violations of ethical codes for persons in the securities industry. Massachusetts law is clear that to give rise to liability the discharge must come from a violation of "clearly established public policy." *Hobson v. McLean Hospital Corp.*, 402 Mass. 413, 522 N.E.2d 975, 977 (1988). Ethical codes in the securities industry are promulgated by private groups, do not have the force of law, and therefore do not establish public policy. *See Smith–Pfeffer*, 533 N.E.2d at 1371 (public policy derives from *law*); *Wright v. Shriners Hospital*, 412 Mass. 469, 589 N.E.2d 1241, 1244 (1992) ("We would hesitate to declare that the ethical code of a private professional organization can be a source of recognized public policy"); *Suchodolski v. Michigan Consolidated Gas Co.*, 412 Mich. 692, 316 N.W.2d 710, 712 (1982) ("The code of ethics of a private association does not establish

public policy [so as to give rise to an employer's liability for discharge].”). I conclude that the Massachusetts Supreme Judicial Court would not impose liability on defendants for discharging plaintiff because of any complaints that defendants had violated or had directed plaintiff to violate any ethical code lacking the force of law.

### V.

Plaintiff has conceded that he cannot prove that defendants violated the securities laws, and presumably the jury should be so instructed. The only issues that remain are whether plaintiff was discharged because he reasonably believed in good faith that the defendants had committed violations of law, and whether he was discharged because he complained of the suspected violations.

### A.

■ Many facts in this case would point to a conclusion that any belief on the part of plaintiff that there had been legal violations was not reasonable. Plaintiff had little training in the area of insider trading; indeed, his duties consisted primarily of ministerial calculations, and he failed the short Chartered Financial Analyst course in which the insider trading subject matter had been presented. Plaintiff's apparent reliance on newspaper articles would on its face appear to be a grossly inadequate education in the complex area of securities law. At least with respect to the matter of trading in Cardis stock, plaintiff knew that the trading in Cardis had been suspended, and that Attorney Rodger had said that a violation would have occurred had trading not been suspended, Sullivan Affidavit ¶ 24, *not* that a violation had actually occurred. However, in light of the allegation in plaintiff's affidavit to the effect that his superior told him "everyone in the industry" engaged in insider trading and that he should drop his concerns due to the profitability of the activities of the persons whom plaintiff allegedly suspected of insider trading, *see* Sullivan Affidavit ¶ 30, I am not prepared on the record to date to conclude that no

reasonable juror could find that plaintiff reasonably believed in the circumstances that actual violations of federal or state law had occurred.

## B.

As to whether plaintiff was fired because of his alleged whistleblowing, several facts would support the inference that he was not fired for this reason. During his tenure at Mass. Mutual, plaintiff never threatened to report any violations to the authorities, and when he did so, it was initially in an anonymous letter to the SEC at least a month *after* he had been fired. And, as noted earlier, defendants have adduced several examples of management's dissatisfaction with plaintiff's work quite apart from the issue of insider trading. Defendants have also noted that the persons who decided to terminate plaintiff were not those whom plaintiff had suspected of insider trading. A jury could infer that the allegations of insider trading were merely revenge for plaintiff's discharge. On the other hand, plaintiff has averred in a sworn statement that one of his supervisors told him that if he persisted in expressing his concerns over insider trading, he would be "out the door." Sullivan Affidavit ¶ 36. I cannot conclude on the basis of the record to date that no reasonable jury could find that plaintiff was discharged because he "blew the whistle" on the suspected violations of law.

This is not to say that courts may not in some circumstances dispose of cases such as this without the assistance of a jury. At least one appellate court has affirmed summary judgment for an employer on the grounds that the plaintiff could not have reasonably believed that his employer was guilty of the alleged illegal activity. *See Schriner,* 421 N.W.2d at 759. Accordingly, the court's decision today is without prejudice to any motion for judgment as a matter of law during or after trial, when the record will be more complete and all of the assertions in plaintiff's affidavit will have been subjected to cross-examination.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment (filed January 11, 1991) (doc. # 65) is GRANTED in part and DENIED in part. The parties shall submit the jointly-prepared form of final pre-trial order by no later than October 1, 1992.

It is so ordered.

Dated at New Haven, Connecticut, this 28th day of August, 1992.