James A. TANASSE; Nadine B. Young; Club St. George, Inc., a Utah corporation; and Young Tanasse, Inc., a Utah corporation, Plaintiffs and Appellant,

v.

Steven SNOW; and Snow, Nuffer, Engstrom and Drake, a Utah corporation, Defendants and Appellees.

No. 960187–CA.

Court of Appeals of Utah.

Dec. 12, 1996.

Robert O. Kurth, Jr., Eichbaker & Kurth, Las Vegas, NV, for Plaintiffs and Appellant.

David Nuffer, Snow, Nuffer, Engstrom, Drake, Wade & Smart, St. George, for Defendants and Appellees.

Before ORME, P.J., and BILLINGS and WILKINS, JJ.

ORME, Presiding Judge:

Plaintiff James A. Tanasse appeals the trial court's postjudgment order dismissing his motion to set aside an execution sale of his cause of action against defendant law firm. The law firm was the only bidder at the sale and purchased the malpractice claim asserted against it, in partial satisfaction of a judgment it held against Tanasse and others. We affirm.

## FACTS

During 1992, defendant Snow, Nuffer, Engstrom and Drake prepared a lease agreement between its client, Club St. George, Inc., as landlord, and Nedra Pauline and Terry Burchinal, as tenants. Subsequently, a dispute arose concerning the lease. Ultimately, a complaint was filed by Burchinal, doing business as Nedra's Cafe, against Tanasse and Club St. George for wrongful eviction. After filing an answer on behalf of Tanasse and Club St. George, the law firm withdrew as counsel on January 5, 1993. Tanasse and Club St. George obtained new counsel to represent them in the wrongful eviction action, which came to trial on September 7, 1993. Burchinal prevailed and a judgment in an amount over $100,000 was entered against Tanasse and Club St. George.

Meanwhile, during February 1993, the law firm filed an action against Tanasse, Young–Tanasse, Inc., and Club St. George seeking to collect a promissory note and attorney fees due on account.[1] The law firm obtained a default judgment on June 8, 1993, in the amount of $14,379.68 plus interest.

Over one year later, on June 13, 1994, Tanasse; Nadine Young, a principal in Young–Tanasse, Inc.; Club St. George; and Young–Tanasse, Inc. served their legal malpractice complaint on defendants. The suit claimed that deficiencies in the lease drafted by the law firm resulted in the wrongful eviction action being successfully pursued to judgment. Thereafter, in October 1994, the law firm sought to recover on its judgment in the collection action by executing on the judgment debtors' interest in the legal malpractice action. On December 1, 1994, the law firm purchased the malpractice claim for $10,000 at a sheriff's sale, whereupon the law firm filed a partial satisfaction of judgment in its collection case for that amount. Tanasse then filed a motion to set aside the sale, which was subsequently denied by the trial court. This appeal followed.[2]

## ISSUES FOR APPEAL

Although Tanasse does not frame the issues on appeal in exactly these terms, we believe the appeal essentially presents these issues for our consideration: (1) Are legal malpractice claims assignable? (2) Even if they are not, may they be reached by execution? (3) Even assuming that a legal malpractice cause of action can generally be levied upon by a judgment creditor through an execution sale, does public policy preclude the very law firm against whom the claim is asserted from purchasing the claim?

## ASSIGNABILITY OF LEGAL MALPRACTICE CLAIM

■ Tanasse vigorously contends that legal malpractice claims are personal and cannot be assigned. Most courts that have considered this issue agree. *See, e.g., Schroeder v. Hudgins*, 142 Ariz. 395, 690 P.2d 114, 118 (App.1984); *Goodley v. Wank & Wank, Inc.*, 62 Cal.App.3d 389, 133 Cal.Rptr. 83, 86 (1976); *Roberts v. Holland & Hart*, 857 P.2d 492, 495–96 (Colo.Ct.App.1993); *Mickler v. Aaron*, 490 So.2d 1343, 1344 (Fla.Dist.Ct. App.1986)(per curiam); *Brocato v. Prairie*

---

1. On August 28, 1992, Tanasse signed a promissory note promising to pay the law firm the total amount of $8000 on or before January 15, 1993. Young–Tanasse, Inc. guaranteed the promissory note. The attorney fees due on account were for work performed by the law firm for James Tanasse and Club St. George.

2. The other defendants in the collection action, Club St. George and Young–Tanasse, Inc., are not parties to this appeal.

*State Farmers Ins. Ass'n,* 166 Ill.App.3d 986, 117 Ill.Dec. 849, 850, 520 N.E.2d 1200, 1201, *cert. denied,* 121 Ill.2d 567, 122 Ill.Dec. 434, 526 N.E.2d 827 (1988); *Picadilly, Inc. v. Raikos,* 582 N.E.2d 338, 342 (Ind.1991); *Coffey v. Jefferson County Bd. of Educ.,* 756 S.W.2d 155, 157 (Ky.Ct.App.1988); *Moorhouse v. Ambassador Ins. Co.,* 147 Mich.App. 412, 383 N.W.2d 219, 221 (1985); *Chaffee v. Smith,* 98 Nev. 222, 645 P.2d 966, 966 (1982)(per curiam). Some courts adopting the majority view reason that a legal malpractice claim arises out of a contract for personal services, and thus, like the underlying contract, is not assignable. *E.g., Goodley,* 133 Cal.Rptr. at 86; *Roberts,* 857 P.2d at 495–96. Others view a legal malpractice claim as akin to a personal injury cause of action, which is not assignable. *E.g., Schroeder,* 690 P.2d at 118–19.

The minority view holds that such claims arise out of routine negligence and breach of contract and, therefore, are freely assignable. *See, e.g., Oppel v. Empire Mut. Ins. Co.,* 517 F.Supp. 1305, 1307 (S.D.N.Y.1981); *Thurston v. Continental Casualty Co.,* 567 A.2d 922, 923 (Me.1989); *Collins v. Fitzwater,* 277 Or. 401, 560 P.2d 1074, 1078 (1977); *Hedlund Mfg. v. Weiser, Stapler & Spivak,* 517 Pa. 522, 539 A.2d 357, 358–59 (1988).

## INVOLUNTARY TRANSFER OF LEGAL MALPRACTICE CLAIMS

While the foregoing issue is an interesting one, we need not specifically decide it. Even

if a legal malpractice action cannot be voluntarily assigned, which we will assume for purposes of this case, it does not follow that it is beyond the reach of an involuntary transfer such as a judicially-sanctioned execution sale. *See Riche v. North Ogden Prof. Corp.,* 763 P.2d 1210, 1213 (Utah App.1988), *aff'd,* 784 P.2d 1126 (Utah 1989)(per curiam).[3]

In *Riche,* three medical doctors formed a professional corporation. One of the doctors became involved in several unsuccessful investments, culminating in his filing for bankruptcy. *Riche,* 763 P.2d at 1211. The bankruptcy court ordered the trustee to sell the bankrupt doctor's shares of stock at a public sale. *Id.* Riche, a creditor of the doctor, purchased the shares and demanded redemption of the shares at fair market value. *Id.* The corporation refused and argued that since Riche was not a member of the medical profession, he was only entitled to the nominal par value of the stock as contemplated in a stock repurchase agreement. *Id.* at 1211–12. However, this court held that the transfer restrictions contained in the stock repurchase agreement,[4] the articles of incorporation,[5] and state law[6] simply did not address *involuntary* transfers during life. *Id.* at 1213–14. Thus, we concluded that once Riche purchased, at the court-ordered sale, all right, title, and interest of the doctor's bankruptcy estate in the shares of stock, he was entitled, under the stock re-

---

**3.** *But see Mickler v. Aaron,* 490 So.2d 1343, 1344 (Fla.Dist.Ct.App.1986) (per curiam) (concluding potential legal malpractice claims of defendant in personal injury action were not assets upon which plaintiff could execute through use of supplementary proceedings mechanism); *Chaffee v. Smith,* 98 Nev. 222, 645 P.2d 966, 966 (1982)(per curiam)("As a matter of public policy, we cannot permit enforcement of a legal malpractice action which has been transferred by assignment or by levy and execution sale, but which was never pursued by the original client.").

**4.** The restrictions in the stock repurchase agreement only concerned transfers upon the death of a shareholder and voluntary transfers during life. *Id.* at 1213.

**5.** The corporation's articles of incorporation provided:

The transfer and conveyance of this stock shall be restricted in that such stock may be issued, sold or transferred only to a person or persons who are duly licensed to render medical services; any other transfer or issuance of shares shall be void.

*Id.* at 1213.

**6.** When *Riche* was decided, section 7 of Utah's Professional Corporation Act provided:

A professional corporation may issue the shares of its capital stock only to persons who are duly licensed to render the same specific professional services as those for which the corporation was organized. A shareholder may *voluntarily* transfer his shares in a professional corporation only to a person who is duly licensed to render the same specific professional services as those for which the corporation was organized. Any shares issued in violation of this section are void.

Utah Code Ann. § 16–11–7 (1987)(emphasis added).

purchase agreement and Utah Code Ann. § 16–11–13 (1987), to have his shares redeemed for their reasonable fair market value. *Id.* at 1214. The Utah Supreme Court approved of this reasoning and summarily affirmed. *See Riche v. North Ogden Prof. Corp.*, 784 P.2d 1126 (Utah 1989)(per curiam).

In the instant case, the law firm's execution upon the legal malpractice claim worked an involuntary transfer analogous to the trustee's sale in *Riche*.[7] Thus, on the same rationale as advanced in *Riche*, we hold that a purchaser could acquire the interest Tanasse had in the malpractice action at an involuntary execution sale, even if Tanasse would not have been privileged to voluntarily transfer his malpractice claim to an assignee.

■ Additional support for this conclusion is found in the language of Rule 69 of the Utah Rules of Civil Procedure. Rule 69 specifically directs the sheriff to "execute the writ [of execution] against the non-exempt property of the judgment debtor by levying on a sufficient amount of property, if there is sufficient property; *collecting or selling the choses in action* and selling the other property in the manner set forth herein." Utah R. Civ. P. 69(f)(emphasis added). A chose in action has been defined as " 'the right to recover pecuniary damages for a wrong inflicted either upon the person or property. It embraces demands arising out of tort, as well as causes of action originating in the breach of contract.' " *Porter v. Household Fin. Corp.*, 385 F.Supp. 336, 344 (S.D.Ohio 1974)(quoting *Cincinnati v. Hafer*, 49 Ohio

St. 60, 30 N.E. 197, 198 (1892)). It means the right to recover something by the process of a suit at law. *State v. Miller*, 113 N.J.Super. 1, 272 A.2d 539, 541 (App.Div. 1971). Accordingly, a chose in action can be a cause of action not yet reduced to judgment. Thus, it has been held that a claim for medical malpractice, although undetermined and unliquidated, can be acquired by a creditor through attachment and execution sale. *Woody's Olympia Lumber, Inc. v. Roney*, 9 Wash.App. 626, 513 P.2d 849, 850–54 (1973).[8] In such a case, it is the right to recover money damages that is subject to attachment and execution sale. *Id.*

■ Rule 69 does not restrict a judgment creditor's ability to reach choses in action to those choses which have been reduced to judgment or those which would be voluntarily assignable in the hands of the judgment debtor. On the contrary, the term is used in the Utah version of Rule 69 without restriction of any sort. Therefore, in this case, even assuming that the underlying legal malpractice action could not be voluntarily assigned, we conclude that the right to collect money damages based on the already-asserted legal malpractice action could be levied upon by a judgment creditor of the plaintiff in the malpractice action.[9]

## PUBLIC POLICY AND PROFESSIONAL RESPONSIBILITY

■ Finally, we must decide whether, notwithstanding our holding that a legal malpractice cause of action can generally be

---

**7.** We note there is no evidence that the sale lacked the requisite notice, nor is there any evidence to suggest that the bid was unconscionably low. In fact, the law firm purchased the claim for $10,000, more than half of the amount of its judgment. Given the uncertainties involved in even routine legal malpractice actions, we cannot say on the record before us that the amount of the law firm's bid was unfair.

**8.** We recognize the authority which holds that, as a matter of public policy, a legal malpractice action that has been transferred by levy and execution sale cannot be enforced. *See* 30 Am. Jur.2d *Executions and Enforcement of Judgments* § 153 (1994). However, careful analysis of the case law suggests that this rule may only apply to legal malpractice actions which had not yet been

asserted by the original claimant. *See, e.g., Chaffee*, 645 P.2d at 966.

**9.** By analogy, we note that even in cases where a contract provision prohibits the assignment of rights under the contract, the assignability of a cause of action to collect money damages for breach of that very contract is unaffected by the provision. *U.S. Industries, Inc. v. Touche Ross & Co.*, 854 F.2d 1223, 1234 (10th Cir.1988); *Fuller v. Favorite Theaters Co.*, 119 Utah 570, 572, 230 P.2d 335, 336 (1951)(per curiam). Even in the case of a personal service contract, the party who has performed his or her obligations thereunder may assign the right to receive money due under the contract, even though the contract itself is not assignable. 6 Am.Jur.2d *Assignments* § 16 (1963).

levied upon by a judgment creditor at an execution sale, public policy forecloses such a remedy when the judgment creditor is the very law firm against whom the malpractice action has been brought.

Essentially, Tanasse argues that the Utah Rules of Professional Conduct reflect public policy and that the Rules proscribe the conduct engaged in by the law firm. Tanasse argues that the law firm created a conflict of interest by executing on the legal malpractice claim. Tanasse reasons that by acquiring the legal malpractice action without his consent, the law firm entered into a prohibited transaction and acquired an interest adverse to him in violation of Rule 1.8(a), (b), (h), and (j).[10]

▆▆▆▆ Even assuming that the law firm violated the Utah Rules of Professional Conduct, a matter on which we express no opinion,[11] Tanasse is not entitled to the relief he seeks. The Rules of Professional Conduct are simply not a vehicle for defining public policy.[12] On the contrary, the Rules set forth " 'self-imposed internal regulations prescribing the standards of conduct for members of the bar.' " State v. Ford, 793 P.2d 397, 400 (Utah App.1990)(quoting People v. Green, 405 Mich. 273, 274 N.W.2d 448, 454 (1979)). Violations of the Rules do not provide an aggrieved party with a cause of action or, in this case, a presumption that the law firm breached a legally cognizable duty that requires the execution sale to be set aside. Rather, a party's recourse for a violation of the Rules of Professional Conduct is limited to lodging a complaint with the Utah State Bar. See Ford, 793 P.2d at 400. Thus, the prefatory "Scope" statement of the Utah Rules of Professional Conduct specifically provides, with our emphasis, as follows:

---

**10.** The referenced provisions of Rule 1.8 are as follows:

(a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:

(1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client; and

(2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) The client consents in writing thereto.

(b) A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation.

. . . .

(h) A lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for malpractice unless permitted by law and the client is independently represented in making the agreement or settle a claim for such liability with an unrepresented client or former client without first advising that person in writing that independent representation is appropriate in connection therewith.

. . . .

(j) A lawyer shall not acquire a proprietary interest in the cause of action or subject matter of litigation the lawyer is conducting for a client, except that the lawyer may:

(1) Acquire a lien granted by law to secure the lawyer's fee or expenses; and

(2) Contract with a client for a reasonable contingent fee in a civil case.

Utah R. Prof. Cond. 1.8.

**11.** Although we express no opinion on whether the law firm's conduct violated the Rules of Professional Conduct, we note that the law firm withdrew from representation of Tanasse long before obtaining the judgment in the collection action and prior to its execution on the legal malpractice claim. At the time of the acts complained of, Tanasse was an ex-client, rather than a client, of the law firm.

**12.** Although it is virtually impossible to provide a precise definition of public policy, courts generally draw upon legislative enactments and judicial decisions to identify public policy. Berube v. Fashion Centre, Ltd., 771 P.2d 1033, 1042–43 (Utah 1989). However, only those legislative enactments which "protect the public or promote public interest" will embody public policy, as well as judicial decisions in areas which the legislature has not addressed. Id. at 1043. By contrast, the Utah Rules of Professional Conduct are "self-imposed internal regulations." State v. Ford, 793 P.2d 397, 400 (Utah App.1990). They are not legislative enactments or judicial decisions reflecting public policy. In addition, Tanasse has cited no authority suggesting public policy may be measured by a particular profession's code of professional responsibility. Our independent research suggests just the opposite. See, e.g., Sullivan v. Massachusetts Mut. Life Ins. Co., 802 F.Supp. 716, 727 (D.Conn.1992)("Ethical codes in the securities industry are promulgated by private groups, do not have the force of law, and therefore do not establish public policy."); Wright v. Shriners Hosp., 412 Mass. 469, 589 N.E.2d 1241, 1244 (1992)("We would hesitate to declare that the ethical code of a private professional organization can be a source of recognized public policy.").

*Violation of a Rule should not give rise to a cause of action, nor should it create any presumption that a legal duty has been breached.* The Rules are designed to provide guidance to lawyers and to provide a structure for regulating conduct through disciplinary agencies. They are not designed to be a basis for civil liability.

## CONCLUSION

Although we do not reach the specific issue of whether a legal malpractice cause of action can be voluntarily assigned, we hold that execution upon Tanasse's legal malpractice action was entirely proper under Rule 69 of the Utah Rules of Civil Procedure. Moreover, the Utah Rules of Professional Conduct do not establish public policy and do not otherwise provide Tanasse with a basis for establishing that the law firm breached a legal duty, requiring the execution sale to be set aside.

Accordingly, we affirm the trial court's post-judgment order dismissing Tanasse's motion to set aside the execution sale.

BILLINGS and WILKINS, JJ., concur.