JUDITH M. SMITH-PFEFFER *vs.* SUPERINTENDENT OF THE
WALTER E. FERNALD STATE SCHOOL.[1]

Middlesex.   November 10, 1988. — February 16, 1989.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Contract*, Employment. *Public Policy*.

No considerations of public policy afforded redress to a plaintiff who was
dismissed from her at-will employment after she expressed disagreement
with certain decisions of a superior. [149-151]

CIVIL ACTION commenced in the Superior Court Department
on October 30, 1980.

The case was tried before *Joseph S. Mitchell, Jr.*, J.

The Supreme Judicial Court on its own initiative transferred
the case from the Appeals Court.

*Despena Fillios Billings*, Assistant Attorney General (*Carolyn V. Wood*, Assistant Attorney General, with her) for the
defendant.

*Peter G. DeGelleke* (*Laurence S. Boisvert* with him) for the
plaintiff.

ABRAMS, J. At issue is whether the termination of the plaintiff's at-will employment by the defendant was in violation of
public policy, thus, subjecting the defendant to liability. A

---

[1] The defendant was acting superintendent at Walter E. Fernald State
School when the plaintiff worked there. The plaintiff originally named both
the superintendent and the Department of Mental Health, but voluntarily
dismissed the case against the Department of Mental Health. The defendant
is represented by the Attorney General. The parties thereafter tried the case
as if the defendant were the employer. On appeal, we also shall treat the
defendant as the employer. "The theory of law on which by assent a case
is tried cannot be disregarded when the case comes before an appellate
court for review of the acts of the trial judge." *Kagan* v. *Levenson*, 334
Mass. 100, 106 (1956), quoting *Santa Maria* v. *Trotto*, 297 Mass. 442,
447 (1937).

jury returned a verdict for the plaintiff. The defendant appeals, claiming that the evidence, viewed in the light most favorable to the plaintiff, is insufficient, as a matter of law, to warrant a verdict for the plaintiff. We transferred the case to this court on our own motion. We agree with the defendant that he was entitled to a directed verdict or, in the alternative, the allowance of his motion for judgment notwithstanding the verdict.[2] We reverse and remand to the Superior Court for entry of a judgment for the defendant.

We summarize the evidence in the light most favorable to the plaintiff. *Cort v. Bristol-Myers Co.*, 385 Mass. 300, 301 (1982). The plaintiff began work on September 2, 1979, as unit director for the Greene Unit at Walter E. Fernald State School (Fernald), a facility for the mentally retarded operated by the Department of Mental Health. She was an at-will employee. Before that time, she had worked at Belchertown State School, initially as a student intern, and then for nearly four years as unit director for the medical unit, serving severely retarded and physically handicapped clients. The plaintiff received her doctorate in 1979 in exercise science.[3]

The Greene Unit, the largest unit at Fernald, served approximately 130 to 140 of the most severely handicapped clients. When the plaintiff took over as unit director, there were some

---

[2] We do not agree with the plaintiff's contention that the defendant raised this issue for the first time on appeal. The defendant moved for a directed verdict at the end of the plaintiff's opening statement, at the close of the plaintiff's case, and at the close of all the evidence. He also moved for judgment notwithstanding the verdict or, in the alternative, a new trial. In support of each of these motions the defendant submitted the same memorandum, in which he asserted that the plaintiff's allegations did not fall into any of the established categories of discharge in violation of public policy. The memorandum cited precedent, both from Massachusetts and from other jurisdictions, as to what categories of circumstances had in the past been found to constitute a discharge in violation of public policy. Counsel for the defendant also objected to the jury instructions on the ground that "the question of whether the discharge was in bad faith or [against] public policy is a question of the law that should be decided by the Court and not by the jury." The defendant preserved the issue for appeal.

[3] The plaintiff explained at trial that her course of study included "biology, chemistry, physiology, kinesiology, everything involved with human movement." She specialized in working with the physically handicapped.

twenty-four vacancies among the direct-care staff (charged, among other things, with feeding and bathing clients and changing their diapers). The building was badly infested with cockroaches and lacked adequate housekeeping staff. Shortly after the plaintiff began work, she was obliged to coordinate moving about fifty-five clients from the main Greene Unit building to a different facility, Metropolitan State Hospital (Metropolitan), which was two miles away. The plaintiff continued to be responsible for the clients who were moved to Metropolitan, and had to divide her staff between the two facilities. Metropolitan, too, was unsanitary and had inadequate heat and hot water. At the time the plaintiff took over at the Greene Unit, Fernald was in danger of being decertified by the Department of Public Health, both because of the poor physical plant and because of lack of programming and insufficient staffing to meet the clients' needs.

The plaintiff earned the praise of the defendant, who was then acting superintendent at Fernald, for the progress she made in addressing the Greene Unit's problems. By February, 1980, the plaintiff had succeeded in filling the approximately twenty-four vacancies in the direct-care staff, had moved clients and staff to Metropolitan with a minimum of disruption and bad feelings among the staff, and had helped to draft an interim correction plan addressing the deficiencies that the Department of Public Health had criticized in its survey of Fernald facilities. The defendant told the plaintiff in January, 1980, that the Greene Unit had made progress and that the plaintiff had a very good chance of getting an "upgrading" in position. The deputy superintendent rated the plaintiff in her six-month review as outstanding in management and problem solving, and over-all as being in the top ten per cent of unit directors he had known.

The plaintiff and the defendant came into conflict, however, over the question of the reorganization of Fernald. In the fall of 1979, the defendant had several meetings with all the unit directors at Fernald, including the plaintiff, in which the defendant presented his plan for centralizing the power at Fernald and concentrating it in the hands of the superintendent (himself)

and the assistant superintendent. The plaintiff and her fellow unit directors opposed the plan because it gave the unit directors, who had primary contact with the direct care and professional staff, no opportunity to participate in policy decisions. The unit directors submitted an alternate plan to the defendant in writing sometime in December, 1979, but the defendant refused to consider it.

The plaintiff and one other unit director, as representatives of the group, then met twice with the defendant in a more personal, less confrontational way, to try to explain the unit directors' stance on the reorganization plan. The defendant stated at those meetings that he would listen to the unit directors' views but that his plan was nonnegotiable.

Following these meetings, the unit directors wrote, as a group, to the search committee charged with finding a permanent superintendent for Fernald, expressing their view that the defendant should not be given that position. The letter alleged that the defendant "lack[ed] . . . educational and experiential preparation for the position of superintendent. . . . After requesting and then rejecting input from unit directors, he unilaterally created a plan which would radically, and, in our opinion, disastrously, alter the management structure of the institution . . . [and] compromise service delivery to the residents." The unit directors considered the defendant's "exclusion of middle management in major policy making as a serious indictment of his ability" as an administrator. All nine of the unit directors at Fernald, including the plaintiff, signed the letter.

The unit directors, the department heads, and the defendant met again immediately after the letter was submitted to the search committee. At that point, the defendant undertook to try for the next month to be more attentive to the unit directors' views. One month later, on April 2, 1980, the unit directors and the defendant met again to discuss whether there had been any improvement in the relationship between the defendant and the unit directors. The plaintiff was called away for much of the meeting and so did not hear what the others had said. When she returned to the meeting, she said that, "although there [had been] attempts [at improvements, she] had seen no

substantial changes from [her] unit's perspective." The defendant commented at that point that the plaintiff's statement (or conclusion) was "probably because of [their, i.e., the plaintiff's and the defendant's] special problem." He did not elaborate.

Shortly thereafter, the defendant informed the plaintiff that if she did not resign, she would be discharged on April 26, 1980. He gave as his reason his "dissatisfaction with [her] administrative performance." The plaintiff wrote to the defendant on April 25, asking for an explanation, but none was forthcoming. The plaintiff was dismissed on April 26, 1980.

In his brief, the defendant concedes that the jury could have found the following facts: "[T]he plaintiff performed her duties in a superior manner and . . . was discharged by the defendant, not because of poor job performance, but because she was a signatory to the . . . letter which was highly critical of [the defendant] . . . for her criticisms of his administrative abilities, and for her vocal and persistent leadership of the unit directors in opposing his reorganization plan. The jury could have found that [the] plaintiff's actions were motivated by a sincere commitment to the mentally retarded residents in her unit. The jury could have inferred that the defendant terminated her employment to get rid of an employee he regarded as a trouble maker, and one with whom he personally did not get along." The plaintiff argues that, in light of the facts showing her to be a dedicated, competent public servant, her dismissal violates public policy and entitles her to redress from the defendant. We do not agree.

"Employees have an interest in knowing they will not be discharged for exercising their legal rights. Employers have an interest in knowing they can run their businesses as they see fit as long as their conduct is consistent with public policy. The public has an interest in employment stability and in discouraging frivolous lawsuits by dissatisfied employees." *Pierce v. Ortho Pharmaceutical Corp.*, 84 N.J. 58, 71 (1980). Consistent with these different interests, we have permitted redress for at-will employees based on public policy in some circumstances. Redress is available for employees who are terminated for asserting a legally guaranteed right (e.g., filing workers' compensation claim), for doing what the law requires

(e.g., serving on a jury), or for refusing to do that which the law forbids (e.g., committing perjury). See *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659, 668 n.6 (1981), *S.C.*, 391 Mass. 333 (1984), citing *Pierce* v. *Ortho Pharmaceutical Corp.*, *supra* at 67-70, and cases collected therein. In *DeRose* v. *Putnam Management Co.*, 398 Mass. 205 (1986), we held that public policy protects an employee who is dismissed for refusing to heed his employer's instructions to give false testimony. In *Hobson* v. *McLean Hosp. Corp.*, 402 Mass. 413, 416 (1988), we held that an employee who alleged that she was discharged for enforcing safety laws, as was her responsibility, stated a claim for discharge in violation of public policy. The plaintiff does not claim that these principles are applicable to her case.[4]

The plaintiff would extend the public policy exception to the at-will doctrine to cover discharges of employees without just cause if those employees are performing appropriate, socially desirable duties. She concludes from that principle that "her discharge without cause was for a reason that, as a matter of public policy should be rejected as adequate ground for her discharge." *Phillips* v. *Youth Dev. Program, Inc.*, 390 Mass. 652, 657 (1983). Essentially, the plaintiff's argument would require us to convert the general rule that "an employment-at-will contract [can] be terminated at any time for any reason or for no reason at all,"[5] see *Gram* v. *Liberty Mut. Ins. Co.*, *supra* at 668 n.6, into a rule that requires just cause to terminate an at-will employee. The public policy exception to the at-will employment rule is not that broad.

---

[4] The plaintiff also does not claim that she was terminated to avoid paying her expected future compensation or expected benefits. See, e.g., *Fortune* v. *National Cash Register Co.*, 373 Mass. 96 (1977); *Gram* v. *Liberty Mut. Ins. Co.*, 384 Mass. 659 (1981). Thus, these cases also are inapplicable.

[5] The parties do not argue or suggest that a different rule applies to public employees. Cf. *Ossinger* v. *Newton*, 26 Mass. App. Ct. 831 (1989). We therefore do not reach or decide that issue. We discuss the issue in light of the principles generally applicable to at-will employees. See *Kagan* v. *Levenson*, 334 Mass. 100, 106 (1956); note 1, *supra*.

The plaintiff asserts that the "defendant's administrative policies and planned reorganization of the institution constituted a threat to the well-being of the institution and its residents." How Fernald should be organized is a matter of opinion and of internal policy. Internal policy decisions are a matter of judgment for those entrusted with decision making within the institution. See *Pierce* v. *Ortho Pharmaceutical Corp.*, *supra* at 75. In *Mello* v. *Stop & Shop Cos.*, 402 Mass. 555 (1988), we specifically said that internal matters, including internal policies, could not be the basis of a public policy exception to the at-will rule. *Id.* at 560-561. In the present case, it was the defendant's job to make such policy decisions and to run Fernald. An employee, even one in a socially important occupation, who simply disagrees with her employer's policy decisions, may not seek redress in the courts. "[I]f the present facts should be held to qualify a discharged employee for relief, then a new practical definition might have to be given to employments theoretically terminable at will." *Gram* v. *Liberty Mut. Ins. Co.*, *supra* at 667,[6] quoting *Richey* v. *American Auto. Ass'n*, 380 Mass. 835, 839 (1980). As the issue whether there was a public policy violation is a question of law for the judge, and not for the jury, *Mello* v. *Stop & Shop Cos.*, *supra* at 561 n.7, the defendant was entitled to a directed verdict.[7]

*Judgment reversed.*

*Judgment for the defendant.*

---

[6] *Gram* v. *Liberty Mut. Ins. Co.*, *supra* at 670-671, held that lack of good cause for termination of at-will employment does not by itself give rise to a cause of action for bad faith. See note 2, *supra*.

[7] The plaintiff has asked that we award her costs and attorneys' fees as well as damages under Mass. R. A. P. 25, as amended, 378 Mass. 925 (1979), for delay. Because we have ruled in favor of the defendant, there is no basis for awarding the plaintiff the relief she requests. The request is therefore denied.