Hamlin, Sandra L., J.
This is an action brought by the plaintiff, Gerard Boudreault (“Boudreault”), arising out of the termination of his employment by his former employer, defendant, Transkaryotic Therapies, Inc. (“TECT”). The plaintiff alleges that improper and unlawful conduct on the part ofTKT, and a third-party contractor, Chesapeake Biological Laboratories, Inc. (“CBL”) led to his being fired. The plaintiff brings three claims: Counts One and Three allege slander and intentional interference with contractual relations respectively, against CBL. Count Two alleges wrongful termination against TKT. TKT moves for summaiy judgment asserting that it lawfully terminated the plaintiffs employment for a compelling business reason, namely that CBL’s refusal to allow the plaintiff on their premises precluded the plaintiff from being able to perform a critical part of his job.
For the following reasons, the defendant, TKTs, motion for summaiy judgment is ALLOWED.

BACKGROUND

At this summaiy judgment stage, the facts are reported in the light most favorable to the plaintiff. Anderson Street Associates v. City of Boston, 442 Mass. 812, 816 (2004), citing Augat Inc., v. Liberty Mut Ins. Co., 410 Mass. 117, 120 (1991).
TKT is a biotechnology company that develops biological products to treat diseases, and is headquartered in Cambridge, Massachusetts. CBL, located in Baltimore, Maryland, is a contract manufacturer that performed manufacturing services for TKT during 2000. The plaintiff was hired on or about January 31, 2000, by TKT as a contract manufacturer manager to manage TKTs relationship with its outside contract manufacturers, including CBL. His duties included serving as TKTs representative at CBL during manufacturing, and addressing issues TKT was having with CBL. As TKTs “man in the plant,” the plaintiff spent a significant portion of his time working at CBL.
Karen Kurtz (“Kurtz”), an assistant to CBL’s CEO Thomas Rice (“Rice”), testified that she complained to Rice in mid-September 2000, concerning an incident in which the plaintiff touched her in an inappropriate manner on her neck, shoulder and/or back area, which made Kurtz uncomfortable. Katz also reported the incident to the COO of CBL, John Botek (“Botek”), and informed the CBL executives that there were rumors concerning the plaintiff that they might want to investigate. Rice contacted Theresa Connolly, Esq. (“Connolly”), an employment lawyer at Piper Marbuiy Rudnick & Wolfe, LLP (“Piper Marbuiy”) for advice as to CBL’s proper course of conduct. Connolly advised Rice to investigate the allegations in a discreet manner because it potentially sounded in sexual harassment. The plaintiff disputes the sequence of events concerning Kurtz’s report of the alleged incident, and CBL’s decision to contact Connolly.
Rice and Botek assert that they conducted an investigation and spoke with additional CBL employees, and that other employees disclosed other incidents of inappropriate conduct on the part of the plaintiff. The plaintiff disputes that such an investigation took place, pointing out that Botek’s notes from the investigation have not been found, and other alleged inconsistencies. Rice and Botek assert that based on further advice from Connolly regarding the investigation, they decided to ban the plaintiff from the premises.
On or about September 15, 2000, Rice and Botek telephoned William Fallon (“Fallon”), who served as the plaintiffs supervisor at TKT, as .well as TKTs Vice President of Manufacturing. They informed Fallon of the details of their investigation and of their decision to ban the plaintiff from the premises at CBL. On or *485 about September 18, 2000, another phone call took place between TKTs General Counsel, Michael Astrue (“Astrue”), and CBL executives in which the CBL executives discussed the credibility of the complaints made by CBL employees. Again, the plaintiff disputes the sequence of events regarding CBL’s decision to contact Connolly, and its relation to the investigation and discussions with TKT executives.
The plaintiff met with Fallon and Astrue on September 22, 2000 and was informed that his employment was being terminated effective September 25, 2000. TKT contends that the termination was based on the fact that as the “man in the plant,” the plaintiff could no longer fulfill his duties if he was banned from the premises of CBL. In addition, TKT was informed of several comments that they considered inappropriate that the plaintiff had made to CBL executives regarding the state of the company. The plaintiff asserts that ulterior motives existed for his termination, namely that he was preventing CBL from producing a drug, Replagal, that TKT was in a race with Genzyme to produce and distribute on the market for treatment of Fabiy’s disease in humans. The plaintiff asserts that TKT, and Astrue in particular, were troubled by the plaintiffs efforts in ensuring that CBL complied with Good Manufacturing Practices (“GMPs”), and that TKT’s stated reason for firing him was pretextual and a “sham.”

DISCUSSION

Summary judgment is appropriate where the “pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Highland Ins. Co. v. Aerovox, Inc., 424 Mass. 226, 232 (1997), citing Mass.R.Civ.P. 56(c). “In a case such as this, where the opposing party will have the burden of proof at trial, the moving party is entitled to summary judgment if they can demonstrate by reference to these materials, unmet by countervailing materials, that the party opposing the motion has no reasonable expectation of proving an essential element of that party’s case.” Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). While the judge is bound to view the evidence in a favorable light to the plaintiff in this case, “the opposing party cannot rest on his or her pleadings and mere assertions of disputed facts to defeat the motion for summary judgment.” LoLonde v. Eissner, 405 Mass. 207, 209 (1989), citing Community Nat’l Bank v. Dawes, 369 Mass. 550, 554 (1976).
As an at-will employee of TKT, the plaintiffs employment was “terminable by either the employee or the employer without notice, for almost any reason or for no reason at all.” Wright v. Shrirners Hosp. for Crippled Children, 402 Mass. 469, 472 (1992), quoting Jackson v. Action for Boston Community Dev., Inc., 403 Mass. 8, 9 (1988). An exception to this general rule exists when employment “is terminated contrary to a well-defined public policy.” Wright, 412 Mass, at 472. Certain examples of this exception include protecting employees who are terminated for asserting a legally guaranteed right such as a workers’ compensation claim, for doing what the law requires them to do, such as serving on a jury, or for refusing to do that which the law forbids, such as committing perjury. Id., citing Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 404 Mass. 145, 149-50 (1989). To succeed under this exception, a plaintiff also must demonstrate that the termination was the result of the conduct and was related to the public policy issue. See Shea v. Emmanuel College, 425 Mass. 761, 763-64 (1997).
The facts and circumstances surrounding this case are markedly similar to those in Wright, which involved a nurse who brought a wrongful termination claim against a hospital based on the same public-policy argument that the plaintiff asserts. See Wright, 412 Mass, at 470. In Wright, a survey team visited the hospital and interviewed the plaintiff as part of an investigation resulting from internal concerns that had been expressed regarding the medical staff and administration of the hospital. Id. at 470-71. The plaintiff detailed problems and specific examples of communication and patient care, as well as criticizing the staff and the assistant chief of staff. Id. at 471. The hospital administrator ordered the termination of the plaintiff for what he deemed to be “patient care issues that had arisen as a result of the surveys,” and the plaintiff alleged that what she considered a retaliatory firing violated public policy and was actionable. Id. at 472.
In Wright, the SJC reasoned that they were “unaware of any statute that clearly expresses a legislative policy to encourage nurses to make the type of internal report involved in this case.” Id. at 474. Further, the plaintiff had testified that “she did not consider the patient care that caused her concern to be abuse, neglect, or mistreatment warranting a report to the department, nor did she feel that there was an issue of physician incompetence warranting a report to the board of registration in medicine as required by G.L.c. 112, §5F.” Id. Despite the plaintiffs urging, the SJC refused to deem a regulation promulgated by the Board of Registration in Nursing as a source of well-defined public policy sufficient to modify the general at-will employment rule. Id. Such an “internal matter” was not a sufficient basis for the public policy exception. Id., citing Smith-Pfeffer, 404 Mass, at 151.
In this case, the plaintiff alleges that he was terminated from employment because he impeded the speed with which TKT could beat its competitor in manufacturing a drug. While the plaintiff has not set out any policy in Massachusetts upon which to base his public policy exception, he points out that the FDA can dictate public policy, more specifically the policies *486 set forth in 21 C.F.R. §211.1. Similarly to the plaintiff in Wright, however, Boudreault’s testimony is particularly relevant. The plaintiff emphasizes the safety risks involved in the particulate investigation, and that the adulterated drugs violated GMPs as a matter of law. A significant basis of his claim is the recklessness with which CBL was manufacturing the drugs, and that his conduct in working to ensure that this type of behavior was resolved ended up in his being banned from the premises. However, during his deposition, the plaintiff testified that he never threatened to, nor did in fact make a report to the FDA or any federal agency, and that he would have if he considered one warranted. Thus his claim that he was acting pursuant to a well-established public policy based on FDA regulations is without merit even if the Court were to find that the federal regulations constituted a well-defined public policy sufficient to warrant an exception to the general at-will employment rules.
The plaintiffs own testimony is significant once again in demonstrating wilful actions of his employer, TKT. The plaintiff testified that he does not hold TKT responsible for not conducting the investigation to his satisfaction, and that CBL is to blame. Even assuming that CBL did not conduct a proper investigation, and that there was an ulterior motive on their part to get the plaintiff off of their premises, this does not impose any liability on TKT.
The facts in this case also demonstrate that the plaintiff can not satisfy the causation element of his claim. The plaintiff actually concedes that there is no direct evidence, but that there is circumstantial evidence that requires a denial of TKT’s motion. In Shea, 425 Mass, at 763-64, the SJC held that an “assertion or speculation” that the plaintiff was discharged for the asserted reason was not sufficient to create a dispute of material fact concerning the reason for the discharge. While the plaintiff has emphasized what he deems to be inconsistencies and holes in the defendants’ version of the facts, he provides no direct evidence. More importantly, however, TKT had a legitimate basis for believing what CBL reported to them, and for terminating the plaintiff s employment based on that information.
In a recent ruling issued by the United States Court of Appeals for the First Circuit, the court addressed an appeal from a grant of summary judgment for an employer-defendant in an age discrimination suit. Ronda-Perez v. Vizcaya Argentaria, No. 04-2087, (1st Cir. April 13, 2005). The case involved a bank employee who was discharged after another employee claimed that the plaintiff regularly made comments about the physical attributes of female customers entering the bank, and had also engaged in other types of misconduct. Id. After conducting an investigation, which included interviewing several employees, the Human Resources Officer recommended that the plaintiff be terminated from employment. Id. Although it was a case analyzed under the framework for a discrimination suit, the plaintiff alleged that the asserted reason for his firing was a pretext for the actual reason, which was his age. Id. The analysis of the pretextual stage of such a suit is helpful in approaching the case at bar.
In analyzing the plaintiffs allegations of pretext, the court addressed numerous allegations which he claimed comprised “fishy” characteristics of the investigation. Id. The plaintiff alleged, among other things, that there were contradictions in statements from disinterested witnesses, that there were procedural irregularities indicating a suspicious investigative process, and that notes were not taken during his interviews. Id. The court rejected the argument stating that “a spirited volley” of charges that the plaintiff hoped would be viewed as proof of his discrimination claims were insufficient. Id. The court held, in affirming the grant of summary judgment, that “the dozen perceived chinks in appellee’s reasons for terminating plaintiff let in no light as to any true reason, do not add up to the slightest suggestion of an effort to deceive or cover up a hidden motive, and obviously fail to indicate that there is a viable issue” concerning the plaintiffs allegations to bring the case before a trier of fact. Id.
In this case, the plaintiff attempts to place numerous “chinks” in the defendant’s reasons for his termination. However, the speculative nature of the allegations, along with the lack of any direct evidence as to how the alleged public policy violation was causally related to his being terminated from employment by the defendant weigh heavily against the plaintiff.
A common sense approach to the issue of whether the alleged public policy violation was causally related to the plaintiff being fired also demonstrates certain shortcomings of the plaintiffs argument. TKT hired the plaintiff to be their “man in the plant” and to address issues they had with CBL. Why would TKT hire the plaintiff to do this j ob if they were going to end up firing him for actually doing what he was supposed to do? The plaintiff also concedes that TKT’s Quality Department approached the particle issue in an attempt to understand the nature and causes of it. The evidence also demonstrates that the investigation continued well after the plaintiff was banned from CBL and fired by TKT.

ORDER

It is therefore ORDERED that the defendant, TKTs, motion for summary judgment is ALLOWED.