Agnes, Peter W., J.
1. Introduction
This is a civil action brought by Howard Sobel (“plaintiff’) against Benchmark Assisted Living, LLC (“defendant”) as a result of the defendant’s termination of the plaintiffs employment as the Executive Director of the Tatnuck Park Assisted Living Facility in Worcester (“facility”). The plaintiffs complaint alleges three causes of action: first, defamation based on statements the defendant’s agent made to a newspaper reporter that the plaintiffs termination was based on “amply documented poor job performance”; second, a contract claim based on the theory that the defendant’s issuance of an employee handbook containing a progressive discipline process created enforceable rights in favor of the plaintiff; and third, a claim that even if the plaintiff was an at-will employee of the defendant, his termination was unlawful because he was discharged in bad faith in contravention of a public policy. For the following reasons, the defendant’s motion for summary judgment is ALLOWED.
2. Factual background
The essential material facts are not in dispute. The defendant is a not-for-profit, foreign, limited liability corporation which develops, owns and manages assisted living facilities for seniors. In early 2004, John L. Hopkins, the CEO of defendant, contacted the defendant about the position of Executive Director of the company’s facility in Worcester. The two had a previous, good working relationship in the hospitality/lodging industry. After the interview process, the plaintiff was hired with a start date of March 1, 2004. At the time of his hire, the plaintiff received a copy of the defendant’s employee handbook known as the “Associated Workplace Guidelines” (“handbook”). SeeDefendant’sAppendixofFactual Submissions, Exhibit 4 (complete text); exhibit B & C to the Plaintiffs complaint (excerpts). The handbook contains a disclaimer, in bold lettering, on page six that the policies contained in it “are not intended to give rise to contractual rights or obligations.” It goes on to say in the same bolded paragraph that “(t]his Handbook is not intended to be a contract of employment between Benchmark Assisted Living and its Associates nor are there any promises made in this Handbook.” The defendant read the handbook and signed an acknowledgment that indicates the policies in the handbook were “for guidance only and may be unilaterally changed or amended” by defendant. The acknowledgment also states that the employee’s at-will status may only be modified by a written contract signed by the Senior Vice-President of Human Resources. See Defendant’s Appendix of Factual Submissions, Exhibit 5. The plaintiff also signed a Nondisclosure Agreement which states specifically that it does not constitute a contract of employment and does not give employees any right to continued employment with the defendant.
3.
As the Executive Director, the plaintiff was responsible for the overall management of the community. He was assisted by an in-house management team and has access to corporate staff for additional support. It is fair to say that the plaintiff and defendant do not agree on the plaintiffs effectiveness as Executive Director during his approximately one-year tenure.
4.
In August 2004, the plaintiff began to report to Debra Gardner-Hussey who was the defendant’s Vice-President of Operations. About this time, the Tatnuck facility became involved in a program known as “Focus 8" which was created by the defendant to help improve the performance of certain of its facilities. The plaintiff and other senior managers of the defendant attended monthly meetings designed to identify areas in which steps could be taken to improve the performance of the facilities by increasing revenues among other things. One of the plaintiffs principal factual assertions is that in late 2004 he was ordered to inform residents that their costs would be increased by 12-14% in 2005 even though he had given them assurances in the past, at the defendant’s urging, that the increase would not be greater than 4-6% (as in previous years). Plaintiff maintains that as a result of his refusal to do so, he was unlawfully terminated. In his deposition, however, the plaintiff indicated that he was never instructed by the defendant to represent what the size of future room and board increases might be, the information he received from the defendant about future room and board increases came from an accountant who simply advised him that increases on average had been between 4-6%. Defendant’s Appendix of Factual Assertions, Exhibit 9 at 128-30. It is plain from the plaintiffs account of his conversations with representatives of the defendant, that he extrapolated from the data about cost increases absorbed by the residents of the facility in the five years preceding 2004 to arrive at a prediction that he made to residents and prospective residents that future increases would be limited to the same percentage. The plaintiff does not assert at any point in his deposition that the defendant instructed the plaintiff to make such representations. Id. at 130-32.-[1]-
5.
The evidence is undisputed that in the fall of 2004, the defendant published proposed rate increases that would be applicable to the Tatnuck facility, among others, and that would take effect in March 2005. The plaintiff became aware of the proposed increases on October 17, 2004, and was invited to offer feedback on them. The defendant offered no feedback in October or November. The plaintiff received another communication from defendant about the rate increases on December 17, 2004. This came in a transmittal from his supervisor, *549 Ms. Gardner-Hussey. The plaintiff called Ms. Gardner-Hussey the same day and voiced his objection that the increases were too high. An agreement between the plaintiff and the defendant was reached whereby the increases would not be made applicable to 4 or 5 residents who had only recently arrived at the facility. Thereafter, on or about January 13, 2005, the plaintiff received the final version of the rate increase letters and was instructed by the defendant to print, sign and distribute the rate increase letters so that residents would receive them by February 1, 2005 in order to permit the rate increase to take effect as of March 1, 2005. The plaintiff refused to carry out this instruction because he did not agree with the rate increase. On February 1, 2005, Gardner-Hussey and the plaintiff had a further conversation in which the plaintiff again restated his opposition to the rate increases and repeated his refusal to send out the letters. Ms. Gardner-Hussey asked the plaintiff for his resignation. The plaintiff refused. Due to a death in the plaintiffs family, the matter was not pursued again until February 7, 2005 when the plaintiff was called to a meeting with the defendant and informed that he had been terminated. He was informed that his termination was based on his “substandard performance” and his “insubordination.”
6.
Within several days of his termination, the plaintiff contacted a reporter for the Worcester Telegram & Gazette Newspaper and informed her that he had been fired for refusing to send out rate increase letters. An article appeared in the Worcester Telegram. & Gazette Newspaper the following day entitled “Hero or mutinous employee? Housing for elderly director out in the cold.” The article in its entirely is contained in Exhibit A to the Plaintiffs complaint and reported that “Yesterday, the owners of Tatnuck Park said Mr. Sobel’s firing was unrelated to the rent hike and that he was let go because of ‘amply documented’ poor job performance. Mr. Sobel said he had never received any verbal or written warning that his work was unsatisfactory.” The article also reported that the plaintiff said he was told by the defendant that he had been fired for “insubordination.” Finally, the article carried a response from a spokesperson for the defendant who indicated that “Mr. Sobel’s job performance was discussed with him by two different supervisors on multiple occasions and that he was once summoned to the corporate office.” When given an opportunity to respond to the column, the plaintiff told the columnist (and she reported) that he had not seen the documentation.
7.
It is fair to say that between the fall, 2004 and the date of his termination on February 1, 2005, the plaintiff and representatives of the defendant had several conversations in which the defendant raised questions about the plaintiff s job performance. However, there is no evidence that the defendant followed the terms of the progressive discipline policy contained in its employee handbook by placing documentation of the plaintiffs poor job performance in written form in his personnel file.
8. Discussion. Count One: Defamation
In order to recover under Count One of the complaint, the plaintiff must prove: (1) the defendant published a statement about the plaintiff, (2) the statement could damage the plaintiffs reputation in the community, (3) the defendant was at fault in publishing the statement, and (4) the statement could harm the plaintiffs profession or business. Ravnikar v. Bogojavensky, 438 Mass. 627, 629 (2003). In this case because the plaintiff brought the entire matter into a public arena by going to the press with a complaint about the defendant’s conduct in terminating him from employment, the plaintiff is considered a “limited issue public figure” with the result that his burden as to the third element is to establish that the statement was false or made with a reckless disregard for the truth. See Bruno & Stillman, Inc. v. Globe Newspaper, 633 F.2d 533, 591-92 (1st Cir. 1980); Murphy v. Boston Herald, 449 Mass. 42, 49-50 (2007); Jones v. Taibbi, 400 Mass. 786, 797-98 (1987). As for the fourth element, “[t]he determination whether the communication complained of is capable of a defamatory meaning is for the court. Once the court has determined that a statement is capable of a defamatory meaning, it is for a jury to decide whether the statement was so understood by its recipient.” Reilly v. The Associated Press, 59 Mass.App.Ct. 764, 778 (2003).
9.
Based on the record before the court, the plaintiff is unable to establish the statements appearing in the newspaper article in question that are attributable to the defendant were false or damaging to the plaintiffs reputation. Because the plaintiff does not dispute that he was fired due to insubordination over the rate increase letters, the allegedly defamatory statement is the one indicating he was fired due to his “amply documented poor job performance.” 'lire plaintiff maybe able to prove that apart from his repeated refusal to sign and distribute the rate increase letters, his job performance was not poor. ’Hie question, however, is whether the plaintiff can prove by clear and convincing evidence that the statements attributed to the defendant are false. The critical inquiry is whether documentation of poor job performance existed. The plaintiff points to evidence suggesting that he performed well in the position of executive Director by increasing the number of residents, that he received a bonus, and was allowed to roll over some of his unused vacation time. See Plaintiffs Affidavit dated September 24, 2007. The flaw in the plaintiffs position is that he views the two statements made by the defendant about the reason for the plaintiff s termination as separate and distinct from each other. The determinative consideration is simply whether the statements made by the defendant were false. There is no dispute in this case that the plaintiff repeatedly refused to carry out the directions of his employer as to *550 the implementation of a rate increase. There is certainly ample documentation of this in the record. The plaintiff admits that he flatly refused to carry out this directive several times in personal conversations or meetings with Ms. Hussey-Gardner. Insubordination is not necessarily separate and distinct from poor job performance. An employee who flatly refuses to carry out his employer’s directions as to matters that relate directly to his duties and the well being of the organization, in circumstances in which the employer has a right to expect compliance, has performed poorly. Thus, on the record before the court, the plaintiff is unable to prove that the statements made by the defendant were false. See Milgroom v. News Group Boston, Inc., 412 Mass. 9, 11-12 (1992).
10. Count two: Contract Claim based on rights established by employee handbook
The plaintiff seeks to bring this case within the exception to the doctrine of employment at-will outlined in Jackson v. Action for Boston Community Development, Inc., 403 Mass. 8, 14-15 (1988), for circumstances in which an employer restricts its common-law right to discharge its employee at will by creating binding terms of employment through the use of a device such as an employee handbook. The ultimate test is whether the contents of the handbook, read together and viewed objectively, establish enforceable obligations on the part of the employer. See Weber v. Community Teamwork, Inc., 434 Mass. 761, 779 (2001). As the defendant points out in its Memorandum of Law at 11-12, the handbook in this case makes it abundantly clear in several prominent places that it is not creating enforceable rights and that the employment contract is one that remains “at will.” Accord, Barry v. Chase Precast Corp., 17 Mass. L. Rptr. 283 (Worcester Superior 2004). Moreover, the plaintiff acknowledged that he did not view the handbook as altering the at-will nature of his employment. Defendant’s Appendix of Factual Assertions, Exhibit 9 at 172-73 (plaintiffs deposition).
11. Count Three: Bad Faith Termination
In Gram v. Liberty Mutual Ins. Co., 384 Mass. 659, 671 (1981), the Supreme Judicial Court declined “to adopt a general rule that the discharge of an at will employee without cause is alone a violation of an employer’s obligation of good faith and fair dealing.” There are exceptions, however, to the general rule that give employers the right to discharge at-will employees without justification of any kind. The one relied on by the plaintiff in this case applies in those circumstances in which termination was for reasons that are contrary to “clearly established” public policy. See Smith-Pfeffer v. Superintendent of the Walter E. Fernald School, 404 Mass. 145, 151 (1989). For the reasons set forth in the defendant’s brief, the questions raised by the plaintiff about the requisite staffing levels at the facility were based on information he gleaned from non-authoritative sources (namely, a consumer guide published by the Massachusetts Chapter of the Alzheimer’s Association) and cannot be equated to a standard that embodies public policy in light of the fact that state regulations exist which cover the matter. See 651 C.M.R. §12.00 et seq. In addition, there is no evidence in the record before the court that the defendant reneged on any promises or agreement it had with any of the residents about rate increases such that the directions given to the plaintiff to support rate increases would be contrary to public policy. The issue is not whether the questions raised and concerns voiced by the plaintiff were relevant to important public policy issues (which include staffing levels at a facility for the elderly certainly), but rather whether the action taken by the employer to disregard the concerns expressed by the plaintiff violates a “clearly established” public policy of the Commonwealth. On the facts before the court, regardless of how concerned the plaintiff was about the qualify of care at the facility, his termination did not violate public policy.
ORDER
For the above reasons, the defendant’s Motion for Summary Judgment is ALLOWED.

In his affidavit of September 24, 2007, paragraph 8, the plaintiff, for the first and only time, states that he was “directed” to tell prospective residents that their rent increases would be in the range of 4-6 percent. Given his earlier denials of any directions in this regard and the consistent testimony of the agents and staff of the defendant, I exercise my discretion to disregard the single statement to the contrary in paragraph 8 of his affidavit. “[A] party cannot create a disputed question of fact by the expedient of contradicting by affidavit statements previously made under oath or at deposition.” O’Brien v. Analog Devices, Inc., 34 Mass.App.Ct. 905, 906 (1993).