Leibensperger, Edward P., J.
Plaintiff, Alana Nelson, claims that she was wrongfully discharged from employment by defendants, Anika Therapeutics, Inc. and Anika’s Chief Executive Officer and President, Charles H. Sherwood. In Count One of her complaint she asserts that she was fired because she communicated to superiors at Anika certain “Bad Practices” and that she is entitled to common-law whistle-blower protection. Thus, she contends, her firing was wrongful because it was a violation of the public policy exception to the employment at-will doctrine. Defendants move for summary judgment dismissing Nelson’s sole remaining count of the complaint.[2] For the reasons stated below, defendants’ motion is ALLOWED.
FACTS
The following facts are taken from the parties’ Consolidated Statement of Undisputed Facts (“SOF”) and the materials submitted therewith, including affidavits and deposition transcripts. The SOF were reviewed by the Court keeping in mind that at the summary judgment stage the undisputed facts should be viewed in the light most favorable to the nonmoving party, Nelson. The Court notes, however, that affidavits and depositions “shall be made on personal knowledge [and] shall set forth facts as would be admissible *614 in evidence ...” Mass.R.Civ.P. 56(e). To the extent that Nelson’s affidavit and testimony contain hearsay, speculation, rumor and opinion, such ruminations are not “facts” and are not considered. Moreover, the Court notes that the 174 paragraphs of the SOF include numerous instances of plaintiff inserting argument and unsupported conclusions in response to a statement of fact, in violation of both the letter and the spirit of Superior Court Rule 9A(b) (5).[3] Where such counters constitute the only response by plaintiff to a statement of fact, then the statement of fact is deemed admitted. Superior Court Rule 9A(b)(5)(ii).
1. Nelson’s Employment History
Anika is a medical device company that invents, develops, manufactures and commercializes therapeutic products for tissue protection, healing and repair. As such, it is regulated by the federal Food and Drug Administration (“FDA”). Sherwood has been the Chief Executive Officer and President of Anika since 2002.
Anika hired Nelson in 1997 as a part-time analytical chemist in the Quality Control (“QC”) department. In December 1998, Nelson was hired on anon-temporary basis in the same position. As a QC Analytical Chemist, her duties included routine testing, validation development, troubleshooting, and testing associated with manufacturing investigations.
In October 2006, Nelson was promoted to the position of QC Lead Analyst. Her duties in this role included leading investigations into out-of-specification (“OOS”) results and managing the laboratoiy. An OOS result is a result in the laboratoiy that does not meet specifications set by Anika’s standard operating procedures (“SOP”). Managing the laboratoiy included testing of raw material, in-process production material, finished product, and production development samples. She was also responsible for environmental monitoring, sampling and testing critical utilities, and for ensuring the laboratoiy was operating within established good manufacturing processes and within Anika’s SOP. Later that same month, the QC Manager (Nelson’s supervisor) resigned from her employment with Anika and Nelson began functioning as the Interim QC Manager until a replacement was found. As Interim QC Manager, Nelson began reporting to Timothy Mayhew, Anika’s Director of Quality. In August 2007, Nelson was promoted to the QC Manager role. In her role as QC Manager, Nelson was responsible for the QC department, consisting of analytical and microbiology laboratories. As QC Manager, Nelson was expected to ensure compliance by the QC department with Anika’s SOP, FDA regulations, and good manufacturing and documentation practices. Duties of the QC Manager also included developing staff budgets, monitoring equipment and supply expenditures, and managing personnel in the QC department.
While not specifically stated in the parties’ SOF, it appears uncontested that Nelson was, at all relevant times, an at-will employee.
2. FDA Review and Criticism
In March 2008, the FDA conducted a routine inspection of Anika. There is no evidence that Nelson, as a whistle-blower or otherwise, initiated the FDA inspection. Likewise, Nelson does not allege, nor is there evidence in the record, that she communicated with the FDA in aid of its inspection or that she reported any alleged wrongdoing or poor practices to the FDA. There is no evidence to suggest that Anika did anything other than encourage its employees to cooperate with the FDA inspection.
On March 21, 2008, the FDA issued a Form 483 to Anika after the inspection of Anika’s facilities. A Form 483 is issued when the FDA finds that a company may not be in full compliance with FDA regulations. The Form 483 indicated that it contains “observations made by FDA representatives during the inspection . . . and [such observations] do not represent a final agency determination regarding your compliance.” The Form 483 contained seven categories of “observations” with subsidiaiy findings regarding each category. Among other things, the Form 483 raised several specific concerns about the QC Department. For example, the FDA observed that “[m]anagement with executive responsibility has not ensured that an adequate and effective quality assurance system has been fully implemented and maintained at all levels of the organization. The responsibilities and procedures applicable to the quality control unit are not fully followed.” At the time the Form 483 was issued, it was Nelson’s responsibility to ensure that the QC department was complying with FDA regulations and the company’s SOP.
On July 2, 2008, the FDA sent a “Warning Letter” to Anika. The Warning Letter, also based upon the March inspection, repeated the concerns raised in the Form 483 and sought corrective action. The FDA stated that Anika’s products were deemed to be “adulterated within the meaning of section 510(h) of the Act, 21 U.S.C. §351(h), in that the methods used in, or the facilities or controls used for, their manufacturing, packing, storage or installation are not in conformiiy with the current Good Manufacturing Practice (cGMP) requirements of the Quality System (QS) regulations ...” The FDA detailed more than eight “violations” and stated that Anika is “responsible for investigating and determining the causes of the violations . . . and for preventing their recurrence or the occurrence of other violations.” The FDA demanded prompt action by the company, warning that failure to act might result in civil action by the FDA to seize or enjoin the products or to seek a civil money penalty. The FDA did not, however, take any action to stop Anika from continuing to market and sell any of its products on the ground that there existed a specific and imminent threat to public safety.
Anika was concerned about the receipt of the Warning Letter. The company had not, during the entire *615 tenure of Sherwood as CEO, previously received such a letter. Because most of the deficiencies in the Warning Letter were in the QC department, Sherwood believed that the Executive Director of Quality, Mayhew, was responsible for poor management of the department. Mayhew was terminated from employment on August 11, 2008.
On December 1, 2008, Anika hired George Kuniholm as Executive Director of Quality Systems. He became Nelson’s supervisor. Kuniholm’s principal goal was to address the issues in the FDA Warning Letter. Shortly after being hired, Kuniholm conducted an internal facilities audit and observed deficiencies in the microbiology laboratory. Nelson, who was in charge of this laboratory, signed off on the audit report acknowledging receipt and review. Kuniholm was concerned that the deficiencies showed lack of progress with respect to the observations by the FDA of the QC laboratory. Kuniholm was also concerned by these deficiencies as they suggested that the QC laboratory was disorganized and not well supervised by Nelson.
On February 11, 2009, Nelson received her 2008 performance review from Kuniholm. Nelson wrote much of this review herself, with the exception of Kuniholm’s overall comments. She criticized herself with respect to not managing her time efficiently and for not completing investigations in a timely manner. She also acknowledged that OOS and environmental control investigations needed to be timely brought to closure, and that this was “nothing [she] hadn’t been told before.” Kuniholm documented his specific concerns about Nelson’s performance as the QC Manager. The overall comments were based in part on the 2008 FDA Warning Letter. Pursuant to this review, Kuniholm demoted Nelson to Supervisor of the Analytical Laboratory. After the demotion, Nelson continued to be responsible for developing the annual budget for the QC department and for ensuring the QC laboratory’s compliance with Anika’s policies. She was no longer responsible for the microbiology laboratory.
Around the same time that Nelson was given her review and demotion, the FDA began an unannounced re-inspection of the facility. The FDA identified an issue with water testing records. An internal meeting was held to discuss these records. During this meeting, Nelson acknowledged that she had not completed the required documentation where the OOS for water testing were thought to be sampling or handling errors. Nelson described this documentation error in an email dated February 23, 2009, where she acknowledged that an “investigation was initiated but paperwork was not carried through for many cases ... [ajnalytical error did not get an investigation OOS . . . [a]n investigation should have been initiated by QC but was not because of confusion in closing related investigation.”
On March 20, 2009, the FDA issued another Form 483 to Anika based on its findings during the February audit. The new Form 483 was primarily focused on the QC department. Specifically, it was noted that there had been a failure to address laboratory result anomalies in a manner consistent with Anika’s SOP. In her deposition, Nelson admitted that it was her responsibility to ensure that investigations were properly documented. In response to these documentation failures cited by the FDA in the March 2009 Form 483, Kuniholm decided to terminate Nelson’s employment. He worked with Anika’s Human Resources Department to begin the process. Kuniholm documented his reasons for Nelson’s termination in a memorandum drafted on March 20, 2009. In the memorandum, Kuniholm set forth five specific reasons for termination (e.g., “you have not been addressing laboratory result anomalies ... in a timely and effective manner”) and several general reasons (e.g., inability to prioritize; ineffective management of resources). The termination was finalized on March 23, 2009. In the days following Nelson’s termination, Kuniholm found as many as thirty-five uncompleted OOS reports that were left in Nelson’s office.
Nelson admitted in her deposition that she has no evidence in the form of personal knowledge, documents or statements by any individuals, to show that Sherwood played a role in her termination. Sherwood testified that he had no input on the decision to terminate the employment of Nelson. Kuniholm, by affidavit, stated that he did not consult with Sherwood regarding the termination.
3. Nelson’s Alleged Whistle-blowing
In opposition to summary judgment Nelson submitted a thirteen-page, sixty-paragraph affidavit dated May 2, 2011. While the affidavit includes numerous opinions, conclusions and hearsay statements, it serves the purpose of summarizing Nelson’s claims for wrongful termination. It is notable as much for what it does not say as for what is included.
Nelson states that she observed a lot of tension in the company after the FDA inspection and reports in 2008. The QC department did, however, take steps to perform corrective actions. Nelson alleges that the workload of the QC laboratory increased dramatically, extending to seven days a week for salaried employees.
Nelson’s duties as QC Manager at Anika included staff budgets. In connection with the staff budgeting process for 2009, Nelson requested additional staff. Her justification for this request was that her staff was overworked, and that more staff was needed in order to complete work in a timely manner. She requested the hiring of a microbiologist and two analysts. After these staffing requests were approved, Nelson requested additional staffing from Kuniholm. Kuniholm endeavored to fill the positions she sought. Nevertheless, as a result of what Nelson believed was un-derstaffing, Nelson states that she “complained about safety issues including lack of resources and staff—all of which negatively impact the safety of Anika’s prod *616 ucts and drugs.” Nelson asserts that the inadequate testing procedures and other deficiencies detailed by the FDA were a risk to the health and safety of the consumers of the products.
Nelson’s affidavit does not, however, describe any communications from her to the FDA. There is no allegation of a concern or report by her of criminal wrongdoing at Anika. There is no evidence of anyone at Anika making false statements to the FDA or of management asking anyone to do so. Nelson does not identify a specific act by anyone at Anika that she reported to management or anyone else as an imminent threat to public safety. Instead, her concerns, as set forth in her affidavit, are the same concerns that were already observed and reported by the FDA. She then complains that she was not given sufficient staffing to correct those issues.
In her deposition, Nelson was asked about an Anika product called Elevess, a dermal filler. Nelson testified that she had raised “concerns” regarding Elevess as to whether it was an unsafe product being released to the market. Her concerns were that “process validations” were being done incorrectly and that there may be impurities in the product because the company was not, in her opinion, conducting proper impurity testing. Nelson admitted, however, that she did not know whether the product was actually harmful. The FDA approved Elevess as safe and effective.
Nelson recalled one instance in late 2008 where she felt that she was reprimanded for raising a concern about Elevess. When advising the vice-president of operations that there was difficulty with the syringe popping off in product testing, he responded, “Why are you telling me this?” In response, the director of operations stated, in support of Nelson, “because she’s qualify control and it’s her job.” Nelson concedes that there were no other instances where she felt reprimanded for raising concerns about Elevess. There is no mention in Nelson’s 2008 performance review of anything concerning significant problems with Ele-vess. In fact, Nelson was given a 3.2 rating (exceeds requirements) for supporting the manufacture and product launch of Elevess. In November 2008, Anika stopped producing Elevess because its distributor went out of business.
DISCUSSION
1. Summary Judgment Standard
Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); see Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983). The moving party bears the burden of affirmatively showing that there is no triable issue of fact. See Pederson v. Time, Inc., 404 Mass. 14, 17 (1989). A party moving for summary judgment who does not have the burden of proof at trial may demonstrate the absence of a triable issue either by submitting affirmative evidence negating an essential element of the nonmoving party’s case or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. See Kourouvacilis, 410 Mass. at 716. Once the moving party “establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts which would establish the existence of a genuine issue of material fact in order to defeat [the] motion.” See Pederson, 404 Mass. at 17. The nonmov-ing party cannot defeat the motion for summary judgment by “rest(ing) on his or her pleadings and mere assertions of disputed facts.” LaLonde v. Eissner, 405 Mass. 207, 209 (1989). Applied to the present case, the summary judgment paradigm requires plaintiff to come forward with some evidence to suggest that her employment termination was as a result of retaliation against her for conduct that is protected by well-established public policy.
2. Public Policy Exception to Employment At-Will Doctrine
An at-will employee may be fired “for almost any reason or for no reason at all.” Wright v. Shriners Hosp. for Crippled Children, 412 Mass. 469, 472 (1992), citing Jackson v. Action for Boston Community Dev., Inc., 403 Mass. 8, 9 (1988). A “narrow exception” to that rule is where the discharge is for reasons that violate clearly established public policy. Smith v. Mitre Corp., 949 F.Sup. 943, 948 (D.Mass. 1997), citing Flesner v. Technical Communications Corp., 410 Mass. 805, 810 (1991). It is a question of law for the court to decide whether an alleged retaliatory firing would violate public policy. Wright, 412 Mass. at 472.
Examples of employee conduct that is protected by a well-defined public policy include asserting a legally guaranteed right (e.g., filing a workers’ compensation claim), doing what the law requires (e.g., serving on a jury), or refusing to do that which the law forbids (e.g., committing perjury). Also, an employee may not be terminated for assisting in an ongoing governmental investigation into illegal conduct of his employer, Flesner, 410 Mass, at 810-11, or making a good faith complaint within the company about perceived violations by the company or its employees of the criminal law. Shea v. Emmanuel College, 425 Mass. 761, 762-63 (1997). As stated by the Supreme Judicial Court in Shea, “(t]he distinction of importance is between a discharge for an employee’s internal complaint about company policies or the violation of company rules, for which liability may not be imposed, and an internal complaint made about alleged violation of the criminal law for which we now decide that liability may be imposed.” Id..
The public policy exception does not protect all employee acts that may be “appropriate [or] socially desirable.” Smith-Pfeffer v. Superintendent of the Walter E. Fernald State Sch., 404 Mass. 145, 150 (1989). *617 The protection does not extend so far as to cover reporting by an employee of alleged conduct that might pose a threat to the well-being of users of the corporate services. Wright, 412 Mass. at 472-73 (no violation of public policy where a nurse fired for criticizing, as required by the nursing ethical code, the quality of care rendered to patients at hospital). See also Kyle v. Massachusetts Gen. Hosp., 61 Mass.App.Ct. 1118, 2004 WL 1609113 at*3 (2004) (Rule 1:28 decision) (general allegations of possible criminal consequences flowing from improper patient care are not protected). Moreover, a potential threat to public health or safety must not be too remote or speculative. Generalized concerns that activities of the employer could, possibly, result in alleged harm to health or safety are insufficient. Smith-Pfeffer, 404 Mass. at 151 (concerns regarding the safety and well-being of residents at the institution are insufficient to be protected by the public policy exception). See also King v. Driscoll, 418 Mass. 576, 584 (1994) (alleged wrongful activity of corporation had only a “remote effect” on the public interest and, thus, employee’s participation in lawsuit against company not protected by the public policy exception).
Applying the precedent described above to the facts of this case results in summary judgment for defendants. Nelson’s alleged internal complaints, reports or concerns do not rise to the level of public policy protection recognized by the Supreme Judicial Court. Nelson did not report criminal activity at Anika. See Shea, 425 Mass. at 762-63. She was not asked to make false statements to the FDA or to otherwise not cooperate with the FDA inspections. See Flesner, 410 Mass. at 810. She does not allege that any product sold by Anika was actually unsafe. Instead, her complaints to management (read broadly and in the best light to Nelson) concerned whether there was adequate staff at Anika to comply with company SOP and FDA regulations. Those complaints, while possibly serving a salutary purpose, raise exactly the type of internal policy issues that the Supreme Judicial Court found not to fall within the public policy exception. See Wright, 412 Mass. at 472-73.
Plaintiff argues, however, that the public policy exception has expanded to include protection for an employee’s internal reporting of violations of safety rules or regulations. She relies, principally, upon the following three cases.
In Hobson v. McLean Hospital Corp., 402 Mass. 413 (1988), plaintiff alleged that she was required by state and municipal law and ordinance to have nursing staff supervise patients who desired to cook meals. When she attempted to enforce that requirement, her action caused anger and resentment from the medical staff who, in turn, allegedly caused her discharge from employment. Emphasizing that it was applying a Rule 12(b)(6) standard rather than Rule 56, the Court concluded that reading the complaint with “liberality, we think that the plaintiff has stated a claim in broad terms. It remains to be seen whether when the facts are shown in further proceedings, the plaintiff can make out a case of liability on public policy grounds.” Id. at 416-17 (citation omitted).
Subsequently, in Falcon v. Leger, 62 Mass.App.Ct. 352 (2004), the Appeals Court affirmed a juiy verdict against a supervisor for wrongfully interfering with plaintiffs employment. In discussing whether the supervisor’s conduct was within the scope of his responsibilities, the Court addressed the public policy exception to the employment at-will doctrine: “Our cases have suggested that an employee could be shielded from the risk of discharge if he or she reasonably, but perhaps erroneously, reports that an employer is violating State and municipal laws and ordinances concerning public safety.” Id. at 364. The Court then held that the supervisor’s conduct was unlawful. The conduct in question was the supervisor’s request to plaintiff to conceal unsafe product from an inspector and to lie to the inspector. Id. at 358-59. The Court noted that the conduct of the supervisor was “tantamount to committing fraud” upon a governmental regulator. Id. at 365.
Finally, the Appeals Court recently issued a Rule 1:28 decision, Chernov v. Home Depot, Inc., 78 Mass.App.Ct. 1105, 2010 WL 4178937 (2010). Summary judgment for the employer was reversed by the Court on plaintiffs wrongful discharge claim. The Court stated that “(a]n at-will employee may not be fired for reporting circumstances that the employee reasonably and in good faith believes violate our public safety laws and present a threat to public safety.” Id. at *2. The plaintiff had constantly reported what he believed to be violations of the fire code (a violation punishable by imprisonment) as well as departures from internal company safety rules. The reports were of specific violations that posed an immediate threat to the safety of customers and employees.
Nelson’s contention that these three cases demonstrate a significantly more expansive statement of the public policy exception that prevents summary judgment in her case is rejected. To the extent the cases reflect protection for internal reporting of possible criminal violations or lying to governmental authorities, they are well within the principles set out in Shea and Flesner. To the extent they may be read to include protection for reporting specific safety violations that pose an identifiable threat to the public, such a reading is of no help to Nelson, here. Nelson’s alleged protected activity is the reporting of departures from company policy (that had already been observed and reported by the FDA) allegedly arising from inadequate staff that might possibly allow product to be sold that could be unsafe. There is no allegation or evidence that a product sold by Anika was, in fact, harmful or unsafe.
*618 Nelson’s alleged reporting of a potential threat to public safely is too remote. See Smith-Pfeffer, 404 Mass. at 151. This is especially true in the context of a quality control manager working for a company producing drugs and devices for human use. Essentially any departure from company SOP would have the potential for increasing the risk of harm. That is why detailed SOP are required by FDA regulations. It is the quality control manager’s job to ensure compliance with company SOP. Merely doing that job and reporting deficiencies in compliance, without more, is not the same thing as reporting circumstances that violate public safety laws and present a threat to public safety. The FDA, having observed the violations of company SOP and FDA regulations, did not conclude that there was an imminent risk to public safety such that Anika’s products could not be sold.
Adoption of Nelson’s theory in this case would make the public policy exception swallow the at-will employment doctrine. It would “convert the general rule that ‘an employment at-will contract [can] be terminated at any time for any reason or for no reason at all,’ . . . into a rule that requires just cause to terminate an at-will employee. Nelson’s theory would insulate every quality control or compliance manager from the at-will doctrine where the employee was simply doing his or her job (reporting deficiencies). The public policy exception to the at-will employment rule is not that broad.” Smith-Pfeffer, 404 Mass. at 150.
3. Reasons for Nelson’s Termination from Employment
Defendants seek summary judgment on the additional ground that there is no genuine issue of material fact as to the reason why Nelson was terminated from employment. Defendants argue that even if Nelson was engaged in activity protected by a well-defined public policy, there is simply no evidence of a causal connection between the protected activity and Nelson’s discharge. Instead, they assert, the evidence demonstrates that Nelson was fired for the substantive performance deficiencies described in Kuniholm’s termination memorandum. The Court agrees that there is a fatal lack of evidence on causation even if there were protected activity.
Nelson offers no direct evidence on causation. There is no testimony by her or anyone else of an admission by Anika that she was fired because she reported unsafe conditions or lack of staff in the QC department that resulted in unsafe conditions. Consequently, Nelson must rely upon inferences from all the facts and circumstances to establish causation.
“Where adverse employment actions follow close on the heels of protected activity, a causal relationship may be inferred.” Mole v. University of Mass., 442 Mass. 582, 595 (2004). As in Mole, however, Nelson here cannot establish that temporal connection. Moreover, the facts of Nelson’s discharge by Kuniholm belie any inference of retaliatory motive.
Nelson’s claim is that she was fired because she continuously complained that the company’s SOP could not be executed with the level of staffing in the QC department. She emphasizes that the staffing problem became even more acute after the FDA issued the Form 483 in March 2008. Nelson offers no evidence that she was threatened with termination or reprimanded by her superiors at any time in 2008. The most she can muster is that she felt “scapegoated” by management for the adverse reports from the FDA in 2008. Even if the evidence supported the claim of being unfairly blamed, it does not prove retaliation for conduct protected by public policy. An inference that Nelson’s firing in 2009 was because of her complaints in 2008 is not reasonable or justifiable.
On the other hand, Nelson’s admitted failure to properly document testing procedures and results, cited by the FDA in another Form 483 in March 2009, is the proximate event to the termination of her employment on March 23, 2009. When asked what rationale Kuniholm had for firing her (in addition to the stated reasons in Kuniholm’s termination memorandum), thereby giving Nelson the opportunity to articulate the basis for her retaliation claim, she testified that she did not know Kuniholm’s rationale. She claimed he was doing the bidding of Sherwood and that he, Kuniholm, did not “fight for his people.” The uncontradicted evidence, however, is that Kuniholm made the decision to fire Nelson without any input from Sherwood. Accordingly, the only reasonable inference regarding the cause of Nelson’s employment termination, based upon the evidence and not speculation, is that she was fired for the reasons stated in Kuniholm’s termination memorandum.
4. Claim Against Sherwood
As described above, Nelson cites no admissible evidence to suggest that Sherwood had anything to do with her firing. The evidence offered by defendants that Sherwood was not involved is unrebutted. Thus, the claim against Sherwood must be dismissed.
ORDER
Summary judgment in favor of Anika and Sherwood, dismissing all of plaintiffs claims, is compelled by the record and the law regarding at-will employment. Defendants’ motion is ALLOWED.

On January 22, 2010, this Court (Fremont-Smith, J.) dismissed all counts of Nelson’s complaint other than Count One [26 Mass. L. Rptr. 393].

Plaintiff also submits an “expert” affidavit from Bob West, Ph.D. The affidavit is devoid of any facts and consists entirely of the affiant’s conclusory opinion that plaintiff “was fired as a scapegoat.” The Court disregards this affidavit.